No.  07-4775

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

vs.

WALTER BABB AND JAMES MOORE,

Appellant.

*Appeal from the United States District Court for the
District of Maryland, Northern Division
Honorable Richard D. Bennett, District Judge*

BRIEF OF APPELLEE
UNITED STATES OF AMERICA

Rod J. Rosenstein
United States Attorney

John F. Purcell, Jr.
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
410-209-4855
Attorneys for the Appellee

January 5, 2009

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Traffic Stop of the Intrepid in Cecil County, Maryland on
          November 6, 2003; the Discovery of the Bodies of Alexandria
          Withers and Willie Robinson and the Arrest of James Moore.. . . . . . 3

    B.   Testimony of Davita Bush: the Relationship Between Babb and
          Moore; their Trip to El Paso with Mr. Robinson and Ms. Withers in
          October 2003; Moore's Plan to Become A Cocaine Middleman and
          the Motive for the Murder and Robbery of Ms. Withers and Mr.
          Robinson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.   Testimony of Richard Ronta Jackson, Willie Robinson's Mentor. . 19

    D.   Testimony of Porsha Harper: Moore and Babb Were Together in
          Greensboro on November 5, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . 22

    E.   Testimony of Adrian Williamson and Tony McCormick. . . . . . . . 26

    F.   The Searches of Babb's Residences at 1006 Bellevue Avenue and
          3615 Martin Avenue in Greensboro, NC. . . . . . . . . . . . . . . . . . . . 29

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

I.    THE DISTRICT COURT PROPERLY DECLINED TO GIVE A
      MULTIPLE-CONSPIRACIES INSTRUCTION WHERE THE
      EVIDENCE SHOWED THAT BABB AND MOORE ACTED IN
      UNISON AND WITH A COMMON PURPOSE IN RELATION TO
      THE SAME DRUG TRAFFICKING CONSPIRACY. . . . . . . . . . 34

      A.    Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      B.    Babb and Moore Were Members of the Same Conspiracy. . . 34

II.   BECAUSE THE DEFENDANTS FAILED TO MEET THEIR
      BURDEN OF SHOWING THAT THE CONSPIRACY HAD
      TERMINATED, THERE WAS A SUFFICIENT BASIS FOR THE
      JURY TO FIND THAT THE FIREARMS SEIZED AT BABB'S
      MARTIN AVENUE RESIDENCE ON AUGUST 18, 2004 WERE
      POSSESSED "IN FURTHERANCE" OF THE CONSPIRACY
      CHARGED IN COUNT ONE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      B.    The District Court Properly Found that Venue For Count Seven
            Was Proper In Maryland Because the Defendants Failed to
            Show that the Drug Trafficking Conspiracy Had Terminated by
            August 18, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.  THE DISTRICT COURT CORRECTLY DENIED THE
      DEFENDANTS' REQUEST FOR A JURY INSTRUCTION
      DEFINING "REASONABLE DOUBT.". . . . . . . . . . . . . . . . . . . . . 51

      A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      B.    The District Court Was Correct to Not Instruct the Jury As To
            A Definition of "Reasonable Doubt.". . . . . . . . . . . . . . . . . . 52

IV.  THERE WAS NO IMPROPER COMMUNICATION WITH THE
     JURY THAT REASONABLY AFFECTED THE INTEGRITY OF
     THE JURY'S VERDICT OR THAT REQUIRES REVERSAL OF
     THE DEFENDANTS' CONVICTIONS. . . . . . . . . . . . . . . . . . . . . . 52

     A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     B.  The Alleged "Contact" with the Jurors. . . . . . . . . . . . . . . . . 54

     C.  The Defendants Have Failed to Establish Either that
         Extrajudicial Contact  Occurred or that Any Such Contact
         Affected the Validity of the Jury's Verdict. . . . . . . . . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

STATEMENT WITH RESPECT TO ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Billings v. Polk*, 441 F.3d 238 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Burch v. Corcoran*, 273 F.3d 577 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 57

*Glasser v. United States*, 315 U.S. 60 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Hyde v. United States*, 225 U.S. 347 (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 46

*Joyner v. United States*, 547 F.2d 1199 (4th Cir. 1977). . . . . . . . . . . . . . . . . . . . . 46

*Mu'min v. Virginia*, 500 U.S. 415 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55

*Patton v. Yount*, 467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55

*Remmer v. United States*, 347 U.S. 227 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Reynolds v. United States*, 98 U.S. 145 (1879). . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981). . . . . . . . . . . . . . . . . . . . . . 55

*Smith v. Phillips*, 455 U.S. 209 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988). . . . . . . . . . . . . . . . . 56, 57, 58

*United States v. Al-Talib*, 55 F.3d 923 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Anderson*, 611 F.2d 504 (4th Cir. 1979). . . . . . . . . . . . . . . . . . . . 42

*United States v. Barber*, 80 F.3d 964 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Blackshire*, 538 F.2d 569 (4th Cir. 1976). . . . . . . . . . . . . . . . . . . 47

*United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000). . . . . . . . . . . . . . . . 35, 42

*United States v. Brown*, 923 F.2d 109 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Burgos*, 55 F.3d 933 (4th Cir. 1995).. . . . . . . . . . . . . . . . . 34, 51

*United States v. Burgos*, 94 F.3d 849 (4th Cir.1996). . . . . . . . . . . . . . . . . . . 45

*United States v. Ceballos-Torres*, 218 F.3d 409 (5th Cir.2000).. . . . . . . . . . . . 44

*United States v. Cedelle*, 89 F.3d 181 (4th Cir. 1996). . . . . . . . . . . . . . . . . 53, 59

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . 49

*United States v. Goldberg*, 401 F.2d 644 (2d Cir.1968).. . . . . . . . . . . . . . . . . 46

*United States v. Gray*, 47 F.3d 1359 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . 34

*United States v. Grubb*, 527 F.2d 1107 (4th Cir. 1975). . . . . . . . . . . . . . . . . . 47

*United States v. Hastings*, 134 F.3d 235 (4th Cir. 1998). . . . . . . . . . . . . . . . . 59

*United States v. Horton*, 921 F.2d 540 (4th Cir. 1990).. . . . . . . . . . . . . . . . . . 34

*United States v. Howard*, 115 F.3d 1151 (4th Cir. 1997).. . . . . . . . . . . . . . 36, 39

*United States v. Jones*, 735 F.2d 785 (4th Cir. 1984).. . . . . . . . . . . . . . . . . . . 45

*United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994). . . . . . . . . . . . . . . . 35, 39

*United States v. Lewter*, 402 F.3d 319 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . 44

*United States v. Lomax*, 293 F.3d 701 (4th Cir. 2002).. . . . . . . . . . . . . . . . . . 44

*United States v. Miro*, 29 F.3d 194 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . 60

*United States v. Munoz*, 55 F.3d 923 (4th Cir. 1995).. . . . . . . . . . . . . . . . . . 42

*United States v. Newsom*, 9 F.3d 337 (4th Cir. 1993).. . . . . . . . . . . . . . . . . . 40

*United States v. Olano*, 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Porter*, 821 F.2d 968 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Reives*, 15 F.3d 42 (4th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . 43

*United States v. Rolle*, 204 F.3d 133 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000). . . . . . . . . . . . 35, 38, 39

*United States v. Stafford*, 136 F.3d 1109 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . 58

*United States v. Stewart*, 256 F.3d 231 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . 40

*United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003). . . . . . . . . . . . . . . . 35, 36

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996). . . . . . . . . . . . . . 34, 35, 36, 39

*United States v. Turcks*, 41 F.3d 893 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Turner*, —F.3d— (4th Cir. 2008), 2008 WL 4482985. . . . . . . . . 50

*United States v. Urbanik*, 801 F.2d 692 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . 46

*United States v. Urrego-Linares*, 879 F.2d 1234 (4th Cir. 1989). . . . . . . . . . . . . 47

*United States v. Walker*, 796 F.2d 43 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Williams*, 152 F.3d 294 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . 52

*United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 34

## FEDERAL STATUTES

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

18 U.S.C. § 924(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. § 3742(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Crim. P. 52(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

## STATEMENT OF JURISDICTION

The defendants Walter Babb and James Moore were charged in a Third Superseding Indictment with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; use of a firearm against Willie Robinson and Alexandria Withers in relation to that drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c); and related firearm offenses. The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. Following their conviction and sentencing, the defendants filed timely notices of appeal. This Court has jurisdiction over the defendants' appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1.     Whether the district court properly declined to give a "multiple conspiracy" instruction where the evidence showed that the defendants Babb and Moore acted in unison and with a common purpose as to the drug trafficking conspiracy charged in Count One?

2.     Whether the district court correctly concluded that venue in the District of Maryland was proper for Count Seven's charge of possession of firearms in furtherance of a drug trafficking conspiracy, where the defendants

1

failed to meet their burden of showing that the Maryland-related drug trafficking conspiracy had terminated prior to the seizure of the firearms in North Carolina?

3.     Whether the district court erred by refusing to give a "reasonable doubt"instruction?

4.     Whether the district court committed plain error by not conducting *voir dire* as to whether there was an improper communication that affected the integrity of the jury's verdict?

## STATEMENT OF THE CASE

On November  6, 2003, the deceased bodies of Alexandria Withers and Willie Robinson were discovered by the Maryland State Police in the trunk of a Dodge Intrepid driven by James Moore.  On September 1, 2004, the defendants Moore and Babb were charged in a Second Superseding Indictment returned by a federal grand jury in the District of Maryland.  D-24.[1]  The Third Superseding Indictment was returned on April 6, 2006.  D-19.  A jury trial before United States District Judge Andre M. Davis commenced on April 2, 2007.  The government dismissed Counts Five and Six prior to submission to the jury.  D-14.

---

[1] "D"  refers to the page number of the docket for Maryland district court case number, AMD 04-0190.

" T" refers to the volume and page of the trial transcript.

2

On April 19, 2007, Moore was convicted of Counts One, Two, Three, Four

and Seven. D-15. Babb was convicted of Counts One, Two and Seven, with a

mistrial declared as to Counts Three and Four. D-15.

On July 24, 2007, Moore was sentenced, as to Count One, to life

imprisonment; as to Count Two, to 20 years imprisonment, concurrent to Count

One; as to Count Three, to 120 months consecutive to Count One; as to Count

Four, 120 months consecutive to Count Three; as to Count Seven, to 300 months

imprisonment, consecutive to Counts One and Three, all followed by a five-year

term of supervised release. Babb was sentenced, as to Count One, to life

imprisonment; as to Count Two, to 20 years imprisonment, concurrent with Count

One; as to Count Seven, to 60 months imprisonment consecutive to Count One, all

followed by a five-year term of supervised release. D-14-15. Both defendants filed

timely notices of appeal. D-14.

## STATEMENT OF FACTS

**A.    The Traffic Stop of the Intrepid in Cecil County, Maryland on November 6, 2003; the Discovery of the Bodies of Alexandria Withers and Willie Robinson and the Arrest of James Moore.**

On November 6, 2003, at about 10:28 a.m., Maryland State Trooper Jacob

Cameron conducted a traffic stop of a Dodge Intrepid ("the Intrepid") bearing New

York tags for a speeding violation on northbound Interstate 95 in Cecil County,

Maryland.  T-II:4-6, 47.[2]  The driver of the Intrepid was ultimately identified as James Moore.  The other occupant of the Intrepid was the front passenger, Porsha Harper.  T-II:10-12.

During the course of the traffic stop, various discrepancies in statements to Trooper Cameron by Moore and Harper as to such things as Moore's name, their destination and who owned the Intrepid raised the trooper's suspicions.  It was also discovered that Moore did not have a driver's license.  Moore was also observed to have a bulge in one of his pocket that was found to be wad of U.S. currency in the amount of $1000.  T-II:15-16.

Trooper Cameron, who was a member of a specially trained contraband interdiction team, also noticed that the rear end of the vehicle was unusually low. T-II:7.  When the trooper mentioned this observation to Ms. Harper, she stated that the trunk was loaded with clothing and invited the trooper look in the trunk.  The trooper agreed, at which point Ms. Harper walked to the rear of the Intrepid and opened the trunk in the presence of the trooper and two other members of the interdiction team who had been in the area and arrived soon after the stop.  T-II:21-23.

_____

[2] The traffic stop by the Maryland State Police was recorded and videotaped.

4

Upon looking into the open trunk, the troopers were shocked to observe what appeared to be two dead bodies laying next to each other, in a fetal position, inside the trunk. The bodies were covered in garbage bags at the head and foot and wrapped and bound in comforters. T-II:2. Moore and Harper were immediately arrested and later separately transported to a nearby Maryland State Police barracks to be interviewed. The Intrepid was secured and transported to another barracks (with a garage facility) where a comprehensive search of the vehicle was conducted the following morning pursuant to a search warrant. T-II:29.

Moore was interviewed at about 11:50 a.m. that same morning by State Police Det. Sgt. Jack McCauley. T-II:100-43. While searching Moore prior to the interview, the detective found $726 in another of Moore's pockets. T-II:102. Some of the currency recovered from Moore appeared to be bloodstained and was submitted for forensic examination. T-II:102,105. Sgt. McCauley also found a receipt for a Western Union money order, sent from Greensboro, North Carolina, in the amount of $300 to Davita Bush on October 30, 2003. T-II:102,107. Moore waived his *Miranda* rights, after which he told Sgt. McCauley that there were "hundreds of thousands" of dollars in a backpack in the Intrepid (which had not yet been searched.) T-II :108-09. During the ensuing search, a green backpack was recovered and found to contain $100,380 in U.S. currency. The cash was

5

neatly packaged in bundles secured with money wrappers.  T-II:133-40.  When Sgt. McCauley asked Moore what he was doing with that much money, Moore stated that he was "running drugs" for an individual named Rey Sanchez, who owned the "Crystal Clear" body shop in El Paso, Texas.  T-II:114.  Moore provided several phone numbers for Sanchez.  T-II:115-16.  Moore further stated that he was supposed to meet an individual named Hugo later that day in New York City and exchange the money for cocaine.  T-II:118-19.  Moore stated that he was being paid $5000 for his role in the drug deal.  T-II:118.  Moore also stated that he had paid Ms. Harper $3000 to drive him to New York, and that she had been driving until shortly before the traffic stop.  T-II:123.  Moore described Ms. Harper's house in Greensboro and stated that he met Ms. Harper the previous day, though subsequently Moore stated that he had known Harper for about two weeks.  T-II:136.

Moore denied knowledge of the contents of the "garbage bags" in the trunk.  T-II:126.  At one point during the interview, Sgt. McCauley asked Moore when he had last fired a gun.  Moore first stated that it was several days ago, but he then stated that he had fired several guns "last night" at his home in Andrews, South Carolina.  T-II:132.

6

Autopsies of the two victims were conducted the following day at the Office of the Medical Examiner for the State of Maryland.  The victims were later identified as those of Alexandria Withers, 23 years old, of Greensboro, North Carolina and Willie Robinson, 36, of Danville, Virginia and New Rochelle, New York.  To summarize the findings, Ms. Withers suffered nine gunshot wounds, including shots to the head, some at very close range.  T-III:87, 90-92.  Mr. Robinson was shot four times at close range.  T-III:137-144.  Both victims had been stripped of their outer clothes, which were found in separate bags in the trunk of the Intrepid.  T-II:183-88.  The undershirts of both victims, which they were still wearing, had numerous bullet holes.  T-II: 184, 196.  Several metal fragments were also recovered and later found to be fragments of 9mm bullets. T-II:198-202.

Garbage bags had been inserted over the head and feet of both victims.  T-II:167-68, 170-71, 176.  Those garbage bags, four in all, were submitted for fingerprint examination by the Maryland State Police Crime lab, which subsequently identified multiple fingerprints from James Moore on all four garbage bags.  T-IV:25-32.[3]

---

[3] *See* Government Trial Exhibit 196 (summary of reports of fingerprint examinations)

7

Comforters bound with twine had been wrapped over each body. As a comforter was removed from the body of Mr. Robinson, bloodstained piece of paper bearing the letter "B" and telephone number "336-587-6296" was recovered. T-II:191. That was found to be the number for a Sprint cell phone subscribed to Walter Babb, at 3102 Utah Place, Apt. K, Greensboro, NC. T-II:193-94.

The search of the trunk of the Intrepid further revealed that a shower curtain (from which Moore's fingerprints were also recovered) had been placed in the trunk, on top of which the bodies had been placed. James Moore was also identified as the source of a fingerprint recovered from the money wrapper for one of the bundles of cash from the green back pack recovered in the Intrepid. Willie Robinson's fingerprints were identified on two other money wrappers. T-IV:33-35.

Among the many items recovered from the passenger compartment of the Intrepid, much of which consisted of Ms. Harper's luggage and Moore's clothing, were two mostly full, five gallon cans of gasoline in the back seat area of the passenger compartment. *See* Government Exhibit 102 (photo of gas cans SV-42 and SV-43).

The registration tags on the Intrepid were traced to Barbara Hayes, of New Rochelle, New York. Ms. Hayes was a former girlfriend of Willie Robinson and the mother of his young son. T-III:165-66. Ms. Hayes testified that she gave the

8

Intrepid to Willie Robinson in August 2003, at which time he drove the Intrepid to

Danville, Virginia, where he had been living since 1996. T-III:174-76. Ms. Hayes

also confirmed that Willie Robinson knew James Moore (who had also lived in

New Rochelle) and that Moore and Robinson had recently been in El Paso, Texas

together. T-III:177. Robinson told Ms. Hayes that he had gone to El Paso to "help

James out." T-III:192. Ms. Hayes testified that Robinson moved to Danville,

Virginia, years before to avoid legal trouble in New York. T-III:180. Ms. Hayes

also confirmed that one of Robinson's associates in Danville was Richard Ronta

Jackson, and she identified a pager number she knew to be used by Robinson. T-

III:171, 183. Phone records and witnesses later linked that pager number to

cellphones used by Walter Babb, including the phone number found in the

comforter in which Robinson's body was wrapped.[4]

Tiffany Morton, a friend and neighbor of Alexandria Withers from

Greensboro, testified that on the evening of Wednesday, November 5, she had seen

Ms. Withers leave in the Intrepid with Mr. Robinson, whom she knew as "RD." T-

---

[4] The phone links between certain individuals described herein have not been disputed on appeal. However, Government Trial Exhibit S-24A is a "pen link" summary prepared from voluminous telephone records obtained by the government, in this instance a summary of calls between the cellphone of Walter Babb and the victims between 11/5/03-11/6/03.

9

III:196.  Several days later, after not hearing from Ms. Withers, Ms. Morton reported to the Greensboro Police that Ms.Withers was missing. She later identified Ms. Withers as the dead female found in the Intrepid.

 Another friend of Ms. Withers, Contreader Johnson, also of Greensboro, testified that Ms. Withers and Robinson had recently gone to El Paso, Texas for three or four days.  She also testified that Willie Robinson had asked another friend of Ms. Withers, Lasheena Brooks, to register one of Robinson's vehicles in her name.  T-III:198-99, 212, 213-16.  Ms. Johnson identified cellphones used by Ms. Withers and Mr. Robinson.  T-III:217.  Phone records later linked the phones of Ms. Withers and Mr. Robinson to cellphones used by Walter Babb.[5]

Teresa Hunt was Willie Robinson's girlfriend in Danville, Virginia at the time of his death.  Ms. Hunt confirmed that the Intrepid belonged to Robinson and that he had been working at a small variety store in Danville owned by Mary Barley.  Ms Hunt testified that Ms. Barley was the girlfriend of Richard Ronta Jackson, who was very close friend of Willie Robinson.  T-III:235-40.  Ms. Hunt identified several pager and phone numbers used by Robinson.  Records for these

---

[5] *See* Government Trial Exhibit S-1, a "pen link" summary of contacts between the cellphone of Walter Babb and those of the victims and what is referred to as "Mary Barley's store," in Danville, VA, where Robinson worked at the time of the murders.

numbers later linked them to cellphones and pagers used by Richard Ronta Jackson and Walter Babb, among others.[6]  T-III:241-44.  Ms. Hunt testified that she knew Robinson to both carry and sell firearms.

Ms. Hunt was shown several photographs of firearms that were recovered on August 18, 2004, at Babb's Martin Avenue residence in Greensboro.  She identified several as being exactly like firearms she had seen in Mr. Robinson's possession.[7]  T-III:246-49.  Ms. Hunt also confirmed that Mr. Robinson knew Walter Babb.  She identified Babb in court and stated that she had once driven Robinson to Babb's house in Greensboro. T-III:250-51.

**B.     Testimony of Davita Bush: the Relationship Between Babb and Moore; their Trip to El Paso with Mr. Robinson and Ms. Withers in October 2003; Moore's Plan to Become A Cocaine Middleman and the Motive for the Murder and Robbery of Ms. Withers and Mr. Robinson.**

Davita Bush testified pursuant to the terms of a federal plea agreement to drug trafficking charges in the District of Maryland.  T-VI:4.  Ms. Bush is from

---

[6] *See* Government's Trial Exhibits S-1E (summary of calls between Babb and Robinson pager), S-14 (summary of calls between Babb's cellphone and Richard Ronta Jackson's pager) and S-15 (summary of calls between Babb's cell phone and Jackson's phone.)

[7] The firearms seized at Babb's Martin Avenue residence provide the basis for the Section 924(c) charge in Count Seven, and are described below.

11

New Rochelle, New York.  She was the girlfriend of James Moore at the time of

the murders.  Ms. Bush knew Willie Robinson, a/k/a RD and Roundhead, who was

also from New Rochelle.  She stated that Moore and Willie Robinson had been

involved in drug trafficking together in New Rochelle prior to Robinson fleeing to

Danville, Virginia to escape an arrest warrant.  T-V1:8-11.

In September 2002, Ms. Bush and her two young children moved to

Andrews, South Carolina, with James Moore, who was also fleeing an arrest

warrant.  T-VI:12-14.  On July 4, 2003, Willie Robinson visited Moore and Ms.

Bush in South Carolina and gave Moore a large "cookie" of crack cocaine to sell.

T-VI:16.  The crack was worth at least $3000.  T-VI:17.

Ms. Bush testified that in August 2003, Moore went to El Paso, Texas, to try

to get an old jail buddy, Rey Sanchez, to give Moore several kilos cocaine on

consignment.  T-VI:20-21.  Moore traveled by bus to El Paso and he stayed at

Sanchez's auto body shop for about a week.  Moore returned to South Carolina

empty handed, however, because Sanchez refused to "front" him any drugs.   T-

VI:23, 27.  Telephone records confirm Ms. Bush's account of Moore's trip, during

which Moore frequently called Ms. Bush's cellphone from Sanchez's body shop in

El Paso.  T-VI-23-24.[8]

In September 2003, Ms. Bush left Moore and took her two children to New Jersey to live with her sister.  T-V1:28-29.  Moore and Ms. Bush stayed in contact, however.  In October 2003, Moore told Ms. Bush that he was returning to El Paso to "middle" a cocaine transaction between Rey Sanchez and Willie Robinson. Moore told Ms. Bush that Robinson's source of supply in New York was unable to supply him, and Moore promised Robinson a lower price per kilo.  T-VI:38. Moore told Bush that his plan was to buy cocaine from Sanchez for $10,000 a kilo and sell each kilo to Robinson for $15,000.  T-VI:39.  Bush did not know exactly how much money Robinson took to El Paso, but she testified that Moore told her that it took "all day" to count it.  T-VI:40.

According to Ms. Bush, Moore told her that when Robinson arrived in El Paso (with Walter Babb), Robinson was angry at Moore because Sanchez was not ready to sell any cocaine.  T-VI-41.  Moore told Ms. Bush that he introduced Robinson to another "connect" in Texas and that they did a "deal" for which "half the money" was delivered.  The balance of the money was to be provided upon

---

[8] *See* Government's Trial Exhibit S-18 (summary of calls between Rey Sanchez's body shop in El Paso, Texas and Davita Bush's cellphone between 8/03 - 12/31/03)

delivery of the rest of the cocaine, which was to occur after Moore, Babb and Robinson returned to Greensboro. T-VI-41-42. While Moore was in El Paso, he also complained to Ms. Bush that Robinson was being "greedy." T-VI:44.

Ms. Bush also testified that while Moore was in El Paso with Robinson, she spoke one time (for the first time) with Walter Babb. T-VI:44. Ms. Bush also identified Western Union records for money orders sent to her by James Moore from El Paso, Texas in October 2003. T-VI:45-46, 48-49. Telephone records confirm that beginning on September 28, 2003, Ms. Bush began receiving calls from Moore in El Paso, where Moore remained for about three weeks. T-V1:32-34, 36-37.

Ms. Bush testified that after part of the cocaine deal was completed in El Paso, Moore returned to Greensboro, North Carolina, with Walter Babb and Willie Robinson. T-VI:45. Western Union records confirm that on October 30, 2003, Moore sent money orders to Ms. Bush from Greensboro, North Carolina. T-VI:49. While Moore was in Greensboro, he stayed with Walter Babb at 1006 Bellevue Avenue, where they "wait[ed] for the rest of the drugs to be delivered and for Roundhead [Robinson] to give them the rest of his money." T-VI:49. Moore told Ms. Bush that once they completed the drug deal in Greensboro, he would come to New Jersey to pick up Ms. Bush and her children. T-VI:51. Moore told Ms. Bush

14

that they were just waiting for Robinson to bring the money to Greensboro.  T-VI:51-52.

While Moore stayed at Babb's house in Greensboro, Ms. Bush had several occasions to speak to Walter Babb on his cellphone.  T-VI:49,50.  In one conversation, Babb told Ms. Bush that Moore should not be upset with Robinson because the money Robinson was using wasn't his.  Babb told Ms. Bush that he had gone on the trip to El Paso with Moore and Robinson to "watch over the money."  T-VI:50.

Ms. Bush testified that on November 5, 2003, she spoke to Moore at about 5:19 p.m., at which time Moore told her that would be leaving for New York that night.  Ms. Bush expected Moore to arrive the next morning.  T-VI:53,103.  Ms. Bush learned of Moore's arrest in Maryland on November 6, the day of the arrest.  Ms. Bush called Walter Babb and asked where "James" was.  Babb told her that Moore and Robinson had left separately after their meeting the prior evening.  T-VI:54-55.  Later that day, Babb told her that "his people" had been in the car that had been stopped, and that he could not talk to Bush about it over the phone.  T-VI:56.

Ms. Bush testified that she spoke to Babb again that day and reminded Babb that she knew that Robinson had been with Babb and Moore the previous night.

15

Ms. Bush threatened to give Babb's phone number to the police unless Babb told

her what was going on.  T-VI:57.  Babb responded by telling Ms. Bush to "calm

down."  Babb told her that everything Moore did was for her, that Moore had a "lot

of money" and that "there is enough money" for her "to eat."  T-VI:58, 106.

Over the next few days, Babb sent Ms. Bush several Western Union money

orders from Greensboro, each for several hundred dollars.  T-VI:59.  Babb and

Moore also arranged for Babb's cousin, Stanley Bryant, to deliver payments of

$10,000 and $5,000, respectively, to Ms. Bush in New York in late 2003.  T-VI:60-

62, 66; T-VII:1-12.  Ms. Bush deposited some of this money in Moore's

commissary account at the Cecil County Detention Center.  T-VI:63.  Ms. Bush

estimated that from the day of Moore's arrest until her own arrest in July 2004,

Babb gave or sent Ms. Bush between $30,000 and $40,000.  T-VI:107.

Beginning in late 2003 and until July 2004, Ms. Bush arranged frequent

three-way telephone calls between Babb and Moore (who remained in the Cecil

County Detention Center until August 2004).  During these calls, among other

things, Moore and Babb arranged several money payments to Ms. Bush.  Moore

and Babb also arranged for Ms. Bush to travel to Greensboro to get drugs and

money directly from Babb.  T-VI:70-71,100-103, 107-08; 110-111.  Babb told Ms.

Bush that it was easier for him to give her drugs than money because increasing

16

pressure from the murder investigation in early 2004 made it hard for him to sell drugs.  Babb told Ms. Bush that if she came to Greensboro he would give her drugs that she could then sell to raise money.  T-VI:69.

Ms. Bush made her first trip to North Carolina in early 2004.  She traveled to Greensboro by bus from New York.  T-VI:72-73.  Once in Greensboro, she met Babb at the bus station.  Babb's girlfriend then drove them to Babb's residence on 3165 Martin Avenue, where Babb had moved soon after the murders, and which Ms. Bush correctly identified by photograph.  T-IX:130.

In Ms. Bush's presence, Babb obtained about 200 grams of crack cocaine that was hidden behind ceiling tiles in one of the bedrooms.  T-VI:74- 75.  Bush then returned with the drugs to Cecil County, where she stayed in various motels (as verified by records introduced as Government Exhibit 250).  Ms. Bush smoked some of the crack and gave the rest to several individuals to sell in Cecil County. T-VI:80-81, 99.

Ms. Bush testified that during her stay in Cecil County she used phones at the residence of Tamika Mills to forward calls from Moore (in the detention center) to Babb's cell phone in Greensboro.[9]  T-VI:84-85; 112-13; T-VII:201-37.

---

[9] These calls are confirmed by phone records summarized in Government Exhibit S-25.

17

Ms. Bush also testified that she spoke to Moore and Babb frequently, and that

Moore instructed her to return to Greensboro to obtain money and drugs from

Babb.  T-VI:86, 70.

Ms. Bush arranged the ensuing trip with Babb and Moore, and asked Tamika

Mills and her husband to drive Ms. Bush to Greensboro for $200.  T-VI:87.  The

trip occurred in February 2004.  Ms. Bush again met Babb at the bus station and

went to his residence on Martin Avenue. T-VI:89-90.  While Ms. Bush was at

Babb's residence, Babb received a call from Moore.  T:VI:96-97.  Babb gave Ms.

Bush what she estimated to be a few ounces of cocaine powder and $200.  T-VI:92,

95.  Tamika Mills saw the drugs Ms. Bush received and testified that Ms. Bush was

given about 200 grams of mixed cocaine and crack cocaine.  T-VI:225.

At trial, Ms. Bush also identified the green backpack that contained the

bundles of cash  recovered from the Intrepid.  The backpack had belonged to one of

her children.  T-VI:15.  In addition, Ms. Bush identified a bloodstained long-

sleeved shirt recovered from the Intrepid, from which the DNA of Mr. Robinson

had been identified, as belonging to Moore.  T-VI:116.

18

## C.      Testimony of Richard Ronta Jackson, Willie Robinson's Mentor.

Richard Ronta Jackson was arrested in the Western District of Virginia on January 17, 2003, based on federal money laundering and drug trafficking charges. Mr. Jackson was serving a thirty-year sentence on those charges when he testified at the trial pursuant to an agreement by which he sought a departure for cooperation.  T-IV:87-88.  Jackson testified that he met Willie Robinson in New Rochelle in the mid-1980's.  T-IV:90.  Jackson testified that he had been a drug dealer in Danville, Virginia since the early 1990's and that Robinson moved to the Danville area in 1996.  T-IV:93-95.

Mr. Jackson testified that he helped Robinson "get on his feet" by giving Robinson a "spot" selling crack cocaine supplied by Jackson.  T-IV:96-97. Robinson started out by selling multi-ounces of crack several times a week.  T-IV:98.  By January 2003, Jackson sold Robinson about a kilo of crack on a regular basis.  T-IV:105.  Jackson testified that he typically purchased five or six kilos of powder cocaine at a time, at $20,000 per kilo, from his source in New York.  T-IV:103.  Jackson testified that he personally "cooked" the cocaine into crack, which he taught Robinson to do.  Jackson also taught Robinson other aspects of the drug business, such as how to conduct deals safely and how to handle and quickly dispose of large sums of cash.  T-IV:108, 132-33.

19

Jackson also took Robinson with him to New York and introduced Robinson to his New York source of supply. T-IV:102. Jackson also identified a photograph of a 10mm Glock seized at Babb's Martin Avenue residence on August 18, 2004, as being identical to the 10mm Glock carried by Robinson. Jackson testified that guns were necessary because drug trafficking was a "dirty, dangerous business." T-IV:129-30.

Jackson testified that Walter Babb was one of his crack customers. Jackson testified that his cocaine customers contacted him on his pager, the number for which he identified from records that linked Jackson's pager to cellphones used by Babb and Robinson, whose numbers Jackson also identified. T-IV:109-110,123-124. Jackson met Babb in 1996 or 1997, after which Babb usually bought nine ounces of crack from Jackson "a couple of times a week." T-IV:114- 116,120, 147. By January 2003, when Jackson was arrested, Babb was buying as much as one-half kilo of crack, twice a week. Jackson further testified that after he was arrested in January 2003, Babb still owed him about $12,000 and that he made arrangements from jail for Robinson to meet Babb. T-IV: 125. After Jackson was arrested, Robinson continued to use Jackson's pager.

In November 2003, Jackson was being held as a federal prisoner in a local facility in Roanoke, Virginia. T-IV:134. Up to that time, however, Jackson

continued to speak with Robinson by phone about twice a week.  T-IV:135.

Robinson had told Jackson that a friend of his, Moore, was living in South Carolina

and that Robinson was looking into a "connect" that Moore supposedly had for

cheaper cocaine.  T-IV:138.

 Jackson testified that he spoke to Willie Robinson on the evening of the

murders.  Robinson told Jackson that he and Alex Withers were on their way to

Greensboro.  T-IV:140.  Jackson also knew Ms.Withers, whom he met at Walter

Babb's house in Reedsville, North Carolina (which is just north of Greensboro),  in

2002. T-IV:148-49.  Jackson also spoke to Babb that day and was told that Moore

was staying with Babb in Greensboro.  T-IV:205.

Jackson learned of the murders from his girlfriend, Mary Barley.  Jackson

was told that Robinson's and Wither's bodies were found in Maryland in the trunk

of Barbara Hayes' Intrepid.  T-IV:134.  Jackson testified that upon learning of the

murders, he immediately wanted to speak to Babb because he knew Robinson and

Withers were on their way to Greensboro to meet Babb and Moore on the evening

of the murders.  T-IV:139.

Mary Barley arranged a three-way call in which Jackson spoke to Babb.

Babb told Jackson that he did not know what happened to Robinson, but Babb said

he would look into it.  T-IV:140-41.  Jackson also testified that Babb stated that,

"You can't put that much temptation on no n_____," the "temptation" being money.  T-IV:141.  Jackson testified that Robinson typically had at least $100,000 in cash on hand, which is the amount needed to purchase five kilos of cocaine.  T-IV:141.

**D.    Testimony of Porsha Harper: Moore and Babb Were Together in Greensboro on November 5, 2003.**

Porsha Harper, who was arrested with Moore in the Intrepid on November 6, 2003, testified pursuant to a plea agreement to a criminal information charging her with obstruction of justice.  T-V:7, 9.

Ms. Harper testified that she met Walter Babb in December 2001, while they were living in the same apartment building in Greensboro, North Carolina.  T-V:14-15.  Ms. Harper identified Babb's cell phone number as the number that was found in the comforter in which Robinson had been covered.  Harper claimed she did not know Babb's last name until after she was arrested in 2003; she called him "Brian" or "B."  T-V:15, 26, 30.

In February 2003, Ms. Harper helped Babb rent 1006 Bellevue Avenue, in Greensboro, where Babb was living at the time of the murders.  T-V:22.  Ms. Harper also helped Babb furnish the home with two sofas.  The DNA of Willie

22

Robinson was later recovered from the cushions of one of these sofas.  T-V:24-25.[10]

Ms. Harper testified that beginning in August 2003 she did not see Babb often.  However, in late October 2003, Babb contacted her.  Babb told her he was out of town and he asked Ms. Harper to check in on Adrian Williamson, a/k/a "Pootie Ray," who was watching Babb's house while he was away.  T-V:33, 39. Ms. Harper went to 1006 Bellevue to check on Williamson.  T-V:35-36. Afterwards, she contacted Babb, who told her that he had been in Mexico and had an incident with the police on reentering the United States.  T-V:37-38.[11]  Babb then asked Ms. Harper to do his wash, including his bedding, before he got home. T-V:41-42.  Ms. Harper agreed and took Babb's laundry from 1006 Bellevue to her home to wash.  When Ms. Harper returned to 1006 Bellevue a day or so later, she found that Babb had returned earlier that morning.

---

[10] *See* Copy of Government Exhibit-354 (DNA Summary Chart)

[11] This was confirmed by NCIC records that confirm that "Walter Moses," an alias used by Willie Robinson, was briefly detained in Hudspeth County, which is on the Mexican border about one hour southeast of El Paso, Texas.  Robinson was arrested on an open warrant but released. T-IX:150-155.

23

Ms. Harper testified that James Moore, Alex Withers and Willie Robinson had returned to 1006 Bellevue with Babb. T-V:49. This was the first time she met Moore. Ms. Harper also testified that the Intrepid was parked at Babb's house. Ms. Harper had seen the Intrepid there before and testified that Babb always told her to leave when it arrived because he had "work" to do. T-V:44, 46-48, 62-63. Because of this, Harper associated the Intrepid with Babb being in the drug business. T-V:64-65.

Over the course of the next few days, Ms. Harper visited Babb and Moore at 1006 Bellevue. Ms. Harper became friendly with Moore, who was staying there. T-V:51-53. Moore told Ms. Harper about his relationship with Davita Bush and that he was determined marry her. T-V:56-57. Walter Babb also spoke to Ms. Harper about his plans. Babb told Ms. Harper that he and Moore had a "huge" plan and that Babb was "going to do this last thing and be done with it, be done with the whole thing and live right and do the whole thing with his life." T-V:60-61. Ms. Harper also testified that Moore told her that he had a connection and "some other person that they dealt with wasn't doing the right thing." T-V:61

Ms. Harper testified that on November 5, 2003, at about 2:00 p.m., Moore asked her to drive Moore and Babb to New York. T-V:68-70. Harper explained that she agreed because she had never been to New York City. T-V:78.

24

On the early morning of November 6, Babb and Moore arrived at her house. Moore was driving the Intrepid and Babb was driven by Anthony McCormick, whom Ms. Harper knew to be a friend of Babb. T-V:78-79. Babb, however, told Ms. Harper that the plans had changed and that he could not go because "other business had come up." T-V:81. Babb also told Ms. Harper to drive Moore in the Intrepid, rather than take her car, as originally planned.

Since Ms. Harper associated the Intrepid with Babb's drug trafficking, Ms. Harper asked Babb if there were drugs in the Intrepid. Babb told her there were not. T-V:83.

After her luggage was loaded into the Intrepid, Ms. Harper and James Moore left for New York, early on the morning of November 6, 2003. T-V:84. They were stopped by Trooper Cameron in Maryland later that morning at about 10:30 a.m.

Ms. Harper testified that she drove until shortly before the traffic stop. She stated that during the ride, Moore told he had been the "connect" for a drug deal he did with Babb in Mexico and now he was going take Davita Bush to Florida for Christmas. T-V:86, 87. Moore also told Ms. Harper that there was $300,000 in the car and he placed a $2000 bundle of cash in one of Ms. Harper's boots, from which it was later recovered. T-V:86-88.

25

Ms. Harper denied knowledge of the murders or of the bodies in the trunk, up to the point when she opened the trunk for the Maryland State Police. T-V:90, 93-95. However, she testified that when she opened the trunk, she immediately recognized the comforters because she had just washed them – they came from Babb's house. T-V:95, 113-115.

Ms. Harper testified that in December 2003, Walter Babb put up $22,000 in cash towards her $250,000 bond on state murder charges. T-V:99 -100. After making bail, Ms. Harper returned to Greensboro, where Babb carefully debriefed her as to what had occurred. T-V:104. Ms. Harper learned that Babb had moved from 1006 Bellevue Street to a house on Martin Avenue in Greensboro. T-V:104-05. Ms. Harper testified that during the interval between her release on the state charges and her arrest on the federal charges on August 17, 2004, Babb was in daily contact with her, either by phone or in person, and she identified records that confirmed calls between her phone and several cellphones used by Babb. T-V:106-07, 120-25.

### E.    Testimony of Adrian Williamson and Tony McCormick.

Adrian Williamson, a/k/a/ Pootie Ray, testified that he met Babb in Eden, North Carolina in the early 1990's. T-V:169. Williamson had sold crack cocaine for Babb in Eden. T-V:171. Mr. Williamson was familiar with Babb's various

26

residences in Greensboro both before and after the murders and he also knew

Porsha Harper.  T-V:172.

Mr. Williamson testified that in late October 2003, Babb asked him to watch

his house at 1006 Bellevue Avenue, in Greensboro, for a few days while Babb was

away.  Mr. Williamson was present at 1006 Bellevue when Babb, Willie Robinson

and Ms. Withers departed in Robinson's Intrepid.  T-V:179.  Mr. Williamson

confirmed that while Babb was away Porsha Harper checked in on him and did

Babb's wash.  T-V:179.  Mr. Williamson recalled that after a few days, Babb,

Robinson and Ms. Withers returned in the Intrepid, accompanied by James Moore,

whom he met for the first time.  T-V:181.  Mr. Williamson confirmed that Moore

remained at Babb's house for several days.  Moore was still there a couple of days

later when Williamson returned to 1006 Bellevue and Babb gave Williamson some

crack for watching the house.  T-V:183.

Williamson testified that he met Babb at 1006 Bellevue a day or two after he

heard about the murders.  He noticed that Babb had replaced the two sofas that had

been in the living room.  Mr. Williamson also noticed that Babb had new rugs and

a new shower curtain in the bathroom and that the carpet had been removed from

the floor of one of the bedrooms.  T-V:189.  Mr. Williamson identified photographs

of several items in which the bodies of Ms. Withers and Mr. Robinson had been

27

wrapped as being items he had seen at 1006 Bellevue.  T-V:193.  In addition, Mr.

Williamson testified that he'd seen Babb with various firearms at 1006 Bellevue.

T-V:190.  Mr. Williamson also confirmed that not long after the murders, and

without any explanation, Babb moved to Martin Avenue.  T-V:190.

Tony McCormick testified that he knew Babb from socializing and playing

cards with him from time to time.  T-VII:14-15, 18.  He testified that since Babb

did not drive, Babb often asked McCormick to drive Babb around Greensboro.  T-

VII:17.  Mr. McCormick testified (as confirmed by phone records) that on

November 5, 2003, the evening of the murders, Babb asked him to come to 1006

Bellevue and take him to Ms. Harpers's house.  T-VII:23-24.  Mr. McCormick

testified that when he arrived at Babb's house that evening he knocked on the door

and Babb told him he'd be right out.  T-VII:27.  Mr. McCormick waited outside.

When Babb came outside, he was with an unknown individual (McCormick

was never introduced to Moore).  That person entered the Intrepid, which was

parked in the driveway, and followed Mr. McCormick as he drove Babb to

Harper's house.  T-VII:29-30.  Mr. McCormick testified that he recalled Ms.

Harper saying something about going shopping in New York.  Her luggage was

loaded into the Intrepid and within a few minutes the Intrepid left, driven by Ms.

28

Harper with the other individual as a passenger.  Mr. McCormick took Babb back

to 1006 Bellevue Avenue and went home.[12]  T-VII:35.

Mr. McCormick learned of the murders and the arrest of Ms. Harper when he

a saw televison report depicting the Intrepid that he saw 1006 Bellevue on

November 5.  T-VII:40.  When Mr. McCormick later asked Babb what happened,

Babb told him only that, "One of my friends got killed."  A short time later, Babb

moved from 1006 Bellevue to 3615 Martin Avenue, where Babb was arrested on

August 17, 2004.  T-VII:42.

> **F.    The Searches of Babb's Residences at 1006 Bellevue Avenue and
>         3615 Martin Avenue in Greensboro,  NC.**

As noted above, neither Moore nor Ms. Harper mentioned anything about

Walter Babb or his then-residence at 1006 Bellevue Avenue in Greensboro, after

they were arrested on November 6, 2003.[13]  T-IX:132-34.

On June 9, 2004, however, investigation led to the execution of a search

warrant on the abandoned premises of 1006 Bellevue.  T-VIII:105-6,117-18; T-

---

[12] Mr. McCormick's recollection of the day's events were quite vivid due to the fact that he and his girlfriend had just learned that day that their unborn child would be delivered stillborn the next day, as confirmed by the investigation.  T-VII:21.

[13] 1006 Bellevue was not listed to Walter Babb. The lease was in the name of Nicole Harper. T-VIII:120.

IX:134.  There was no furniture in the house, though an empty box for a Sears wet/dry "shop vac" was located in the crawlspace under the house.  T-VIII:121-22. A section of blue carpet that remained in the house was recovered and shipped to the Maryland State Police Crime lab for DNA testing after several spots on the carpet tested positive for the presence of blood.  Markings on the walls indicated that there had also been a couch in the same room as the blue carpet.  T-VIII:125-37.  The carpet recovered from 1006 Bellevue also bore evidence of heavy cleaning and applications of carpet cleaning products.  T-IX:110-12.

On July 14, 2004, investigators seized evidence consisting of a sofa and cushions from 1010 Bellevue Avenue.  On July 23, 2004, upon testing conducted by technicians from the Greensboro Police Department, a cushion from the sofa seized from 1010 Bellevue Avenue reacted positively for the presence of blood after testing with luminol.  T-VIII:108-12; T-IX:108-9.

Upon examination by the Maryland State Police crime lab for the presence of DNA, sections of the blue carpet from 1006 Bellevue and one of the sofa cushions recovered at 1010 Bellevue were found to match the known DNA of Willie Robinson.  *See* DNA Summary.

On August 17, 2004, pursuant to an arrest warrant issued in the District of Maryland, Walter Babb was arrested at 3615 Martin Avenue, Greensboro.  T-

30

VIII:101-2.  As noted above, according to witnesses including Porsha Harper, Adrian Peterson and Anthony McCormick, Babb moved to this residence from 1006 Bellevue Avenue shortly after the murder and robbery of Ms. Withers and Mr. Robinson on November 5, 2003.  Davita Bush also identified the Martin Avenue residence to be where Babb delivered crack cocaine and money to her on two occasions.

The premises of 3615 Martin Avenue were searched pursuant to a warrant on August 18, 2004.  Among the items recovered were the firearms which provided the basis for the Section 924(c) charge in Count Seven.  Two 7.62 assault rifles were found immediately adjacent to the entrance to the crawl space above the ceiling.  T-VIII:150-51.  A Taurus .45 was found stuffed into the insulation, next to the assault rifles.  T-VIII:155-57.  A drug scale was found nearby.  T-VII:156-57.  A clothing bag in the attic contained shotgun shells, several ammunition magazines, a RG .22 caliber revolver, a .38 Special revolver, a Glock 10 mm semi-automatic handgun and a bag of ecstasy pills.  T-VIII:158-60.  Another scale and several cellphones were found in a bedroom.  T-VIII:162.  The phone number for one of the phones recovered at the Martin Avenue house was identified to be for a cell phone used by Walter Babb in the months after the murders, including calls

31

between Babb and Bush, and between Babb and Moore to facilitate the drug

distribution by Babb to Ms. Bush on February 15, 2004.  T-IX:116-18.

## SUMMARY OF ARGUMENT

First, the court did not abuse its discretion by refusing to give a multiple-

conspiracies instruction.  No such instruction was warranted.  The evidence

showed that after Moore joined the drug trafficking conspiracy, Moore and Babb

acted in unison and with a common purpose, at least until Babb's arrest in August

2004.  Moore and Babb met in El Paso in October 2003 to facilitate the sale of

multiple kilos of cocaine.  Moore and Babb then returned to Greensboro, North

Carolina, together, staying at Babb's residence (1006 Bellevue Avenue) while

waiting for the conclusion of the drug deal they began in El Paso.  The evidence

also showed that Moore and Babb acted jointly on November 5, 2003, when they

robbed and shot Alexandria Withers and Willie Robinson, after which they sought

to conceal their acts from Richard Ronta Jackson (Willie Robinson's mentor), by

transporting the victims and evidence from the crime scene at 1006 Bellevue

Avenue to New York, where the car and bodies would be abandoned and set afire,

creating the appearance that the murders and robbery occurred in New York.

Second, venue was proper in Maryland for the possession of firearms in

furtherance of the drug trafficking conspiracy, because numerous acts in

32

furtherance of the conspiracy occurred in Maryland. The defendants failed to meet their burden of showing that the conspiracy charged in Count One had "terminated" by August 17, 2004, when the firearms described in Count Seven were seized at Babb's residence in Greensboro. To the contrary, after the murders and Moore's arrest on November 6, 2003, Babb and Moore continued to act jointly to distribute crack cocaine through Davita Bush, through whom they also communicated with each other. They also communicated with and influenced others, such as Porsha Harper, to protect the conspiracy from the ongoing investigation and to retain the "tools" of the drug conspiracy, such as several firearms, two drug scales and several cellphones, at Babb's Martin Avenue residence.

Third, based on well-settled law of this Circuit, it is beyond dispute that the court properly declined to give a reasonable doubt instruction.

Fourth, the defendants failed to establish that the court's general remarks concerning attendees at the trial "looking" at the jurors even remotely established that there was an improper communication with the jury, much less that any such communication affected the jury's verdict. There is no merit to the argument that the court's failure, *sua sponte*, to *voir dire* the jury on this subject was plain error.

**ARGUMENT**

**I.    THE DISTRICT COURT PROPERLY DECLINED TO GIVE A MULTIPLE-CONSPIRACIES INSTRUCTION WHERE THE EVIDENCE SHOWED THAT BABB AND MOORE ACTED IN UNISON AND WITH A COMMON PURPOSE IN RELATION TO THE SAME DRUG TRAFFICKING CONSPIRACY.**

**A.    Standard of Review.**

The Court of Appeals reviews the decision to give, or not to give, a jury instruction and the content of that instruction for abuse of discretion.  *See United States v. Burgos*, 55 F.3d 933, 935 (4th Cir. 1995); *United States  v. Wilson*, 198 F.3d 467, 469 (4th Cir. 1999).  Reversal for failure to give a multiple conspiracy instruction is only warranted if the defendants suffered substantial prejudice.  *See United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253 (1997).  This Court normally defers to a district court's decision not to issue such an instruction, *see United States v. Gray*, 47 F.3d 1359, 1368 (4th Cir. 1995), particularly given the "superior vantage point of the trial court" in determining what instructions are warranted by the evidence.  *United States v. Horton*, 921 F.2d 540, 545 (4th Cir. 1990).

**B.    Babb and Moore Were Members of the Same Conspiracy.**

The district court did not abuse its discretion in declining to instruct the jury regarding multiple conspiracies because the evidence demonstrated that the

34

defendants participated together in the single drug conspiracy charged in Count
One.

The defendants assert that the district court should have given a multiple-
conspiracies instruction. App. Brf. at 18. In cases where a defendant is charged
with conspiracy, a district court must issue a multiple-conspiracies instruction
where the evidence supports a finding that multiple conspiracies existed, rather
than a single conspiracy. *See United States v. Tipton*, 90 F.3d 861, 883 (4th Cir.
1996); *United States v. Bowens*, 224 F.3d 302, 307 (4th Cir. 2000).

However, "'[a] multiple conspiracy instruction is not required unless the
proof at trial demonstrates that [the defendant was] involved **only** in [a] separate
conspirac[y] unrelated to the overall conspiracy charged in the indictment.'" *United
States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000) (quoting *United States v.
Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994)). This Court has held that whether there
is a single conspiracy or multiple conspiracies depends upon the overlap of key
actors, methods, and goals. *See United States v. Stockton*, 349 F.3d 755, 761-62
(4th Cir. 2003).

Even where required, failure to give a multiple-conspiracy instruction is not
reversible error unless a defendant can show that this caused him substantial
prejudice. *See Tipton*, 90 F.3d at 883. To find such prejudice, the Court would

35

have to conclude that the evidence of multiple conspiracies was so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction. *See Tipton*, 90 F.3d at 883; *United States v. Howard*, 115 F.3d 1151, 1157 (4th Cir. 1997) (Failure to give a multiple-conspiracies instruction is not reversible error unless the defendant demonstrates that he has been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial.); *Stockton*, 349 F.3d at 761-62 (defendant was not entitled to requested "multiple conspiracies" instruction, in drug conspiracy prosecution, where there was no evidence presented at trial that defendant was involved in a separate conspiracy unrelated to the one for which he was charged).

Here, at the conclusion of the government's case, counsel for the defendants requested that the jury be given a multiple-conspiracies jury instruction, arguing, much as they do now, that there "seem to be discrete and separate bunches of facts . . . and direct and separate conspiracies." T-10:4-5. Having sat through the trial and heard all of the evidence, the district court did not agree:

> Well, I'm constrained to agree with the government. Obviously, I think it's obvious, certainly counsel for the defendants are free if they choose to argue multiple conspiracies, but if would be an extra

36

evidentiary argument, permissible but not supported by the evidence.

The evidence seems clear that this was indeed a single conspiracy with members coming and going, perhaps going. Certainly, Ms Withers and Mr. Robinson had their membership in the conspiracy terminated with extreme prejudice, one might say, but that doesn't change the character of the conspiracy. And even the sort of add-on that Miss Bush brings to the conspiracy after November 2003 really, though factually kind of curious, it really is just a continuation in any meaningful sense of business as usual, selling drugs....

I don't see how a reasonable juror could reasonably conclude as a matter of fact that more than one conspiracy was involved in the circumstances shown by the evidence. So the request for a multiple conspiracy instruction is denied.

T-X:7-8.

There was no factual basis for a multiple-conspiracies instruction because there was nothing "separate" about the conspiracy between Babb and Moore. Once Moore joined the conspiracy as a purported middle-man for a multi-kilo cocaine deal in El Paso between Robinson, Babb and Rey Sanchez, Moore and Babb acted together in the *same* conspiracy.  They went to El Paso together to meet with Sanchez, returned to Greensboro together, and, in early November 2003, while Moore was staying at Babb's Bellevue Avenue residence, they conceived and carried out a plan to forcibly supplant Robinson by robbing and murdering him and Ms. Withers on November 5, 2003.  If one focuses, as the jury was required to do, and as the district court obviously did, on *these defendants*, it

37

is without question that the drug trafficking conspiracy charged in Count One extended in a straight line from Richard Ronta Jackson to Babb and Robinson, and then, beginning (at the latest) in October 2003, directly to Moore.

Even after the murders and the arrest of Moore and Harper on November 6, Moore and Babb were busily occupied in acts of obstruction and drug trafficking that continued until Babb's arrest on August 17, 2003. The jury in this case was presented with evidence of a conspiracy in which the defendants they were called upon to judge were tightly bound together in every act, from the moment Moore joined his old friend, Willie Robinson, and his soon-to-be new associate, Walter Babb, in a deadly partnership. It certainly cannot be said that the defendants were involved *only* in separate conspiracies and not in a single conspiracy, as would be required to support a multiple-conspiracies instruction. *See Squillacote*, 221 F.3d at 574. Accordingly, the district court did not abuse its discretion by refusing to give such an instruction.

Finally, the defendants have failed to show how – or even argue that – assuming that the evidence justified a multiple-conspiracies instruction, they suffered prejudice as a result of the court's failure to give the requested instruction. This Court has repeatedly held that to show actual prejudice stemming from a multiple conspiracy variance between government's evidence and allegations in

38

indictment, a defendant must prove that there are so many defendants and so many separate conspiracies before the jury that it was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy. *See*, *e.g.*, *United States v. Howard*, 115 F.3d 1151, 1157 (4th Cir. 1997) (Failure to give a multiple-conspiracies instruction is not reversible error unless the defendant demonstrates that he has been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial.); *Kennedy*, 32 F.3d at 884; *Squillacote*, 221 F.3d at 574. "To find such prejudice, we would have to conclude that the evidence of multiple conspiracies was so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." *Tipton*, 90 F.3d at 883. Here, the jury was not faced with any of the difficulties described in *Kennedy* or similar cases. There was no error by the court and neither Babb nor Moore suffered any prejudice from the court's denial of the requested instruction.

II.    **BECAUSE THE DEFENDANTS FAILED TO MEET THEIR BURDEN OF SHOWING THAT THE CONSPIRACY HAD TERMINATED, THERE WAS A SUFFICIENT BASIS FOR THE JURY TO FIND THAT THE FIREARMS SEIZED AT BABB'S MARTIN AVENUE RESIDENCE ON AUGUST 18, 2004 WERE POSSESSED "IN FURTHERANCE" OF THE CONSPIRACY CHARGED IN COUNT ONE.**

A.    **Standard of Review.**

The prosecution must establish venue by a preponderance of the evidence, and the trial court's decision is reviewed by this Court *de novo*.  *See United States v. Newsom*, 9 F.3d 337, 338 (4th Cir. 1993); *United States v. Stewart*, 256 F.3d 231, 238 (4th Cir. 2001).

B.    **The District Court Properly Found that Venue For Count Seven Was Proper In Maryland Because the Defendants Failed to Show that the Drug Trafficking Conspiracy Had Terminated by August 18, 2004**.

The defendants next challenge venue in the District of Maryland as to Count Seven of the Third Superseding Indictment, in which both are charged with possession of several specified firearms in furtherance of the drug trafficking conspiracy alleged in Count One, in violation of 18 U.S.C. § 924(c).

The firearms described in Count Seven were recovered pursuant to a search warrant executed on August 18, 2004, on the premises of Babb's Martin Avenue residence in Greensboro, North Carolina, where Babb was arrested on August 17.

Though presented in this appeal as a claim that there was no "venue" in the District of Maryland for the violation of Section 924 (c) charged in Count Seven, the gist of the defendants' claim is actually less an issue of venue than it is simply a question of whether the conspiracy had "terminated" by the date the subject firearms were seized, and, if not, whether the evidence was otherwise sufficient to satisfy the elements of Section 924(c). Simply put, the defendants assert that by August 18, 2004, when the firearms described in Count Seven were seized at 3615 Martin Avenue, Greensboro, North Carolina, the underlying drug trafficking conspiracy charged in Count One had "terminated" and, therefore, these firearms could not have been possessed "in furtherance" of that conspiracy. App. Brf. at 33-34.

The defendants contend that the drug trafficking conspiracy charged in Count One terminated by no later than July 14, 2004, when Davita Bush was arrested, (T-V1:100), and that following her arrest there was a "total lack of communication amongst the defendants." App. Brf. at 34. This argument was also made, and rejected, at the trial, where the district court found, first, that there certainly was no evidence of *withdrawal* from the conspiracy by either defendant and furthermore, that there was no evidence that the conspiracy terminated prior to August 18. T-IX:226.

41

Notably, the defendants accept that venue was proper in the District of

Maryland as to the drug trafficking conspiracy charged in Count One because, as

they concede, "the government established that overt acts in furtherance of the

conspiracy occurred in Maryland."  App. Brf. at 33; *see United States v. Anderson*,

611 F.2d 504, 509 n. 5 (4th Cir. 1979).  Acknowledging that venue existed as to

Count One is appropriate since it is well settled that venue for all members of a

conspiracy lies in any district in which an overt act occurred.  Venue for a

conspiracy charge may be laid "in any district in which a conspirator performs an

overt act in furtherance of the conspiracy or performs acts that effectuate the object

of the conspiracy," even if the defendant charged with the conspiracy never entered

the district.  *See Hyde v. United States*, 225 U.S. 347, 356-57 (1912); *United States

v. Bowens*, 224 F.3d 302, 311 n.4 (4th Cir. 2000) ("In determining venue for a

particular offense, not only is the conduct of the defendant himself considered, but

the conduct of anyone with whom he shares liability . . . ."); *United States v.

Munoz*, 55 F.3d 923 (4th Cir. 1995) (venue for one conspirator served to establish

venue for all codefendant conspirators.). "Because those who commit such crimes

frequently move among various venues, they assume the risk that they may become

subject to prosecution in any of a number of districts." *United States v. Al-Talib*, 55

F.3d 923, 928 (4th Cir. 1995).  It is likewise well-settled that the overt act need be

42

proven only by a preponderance of the evidence and need not be substantial.  *See United States v. Porter*, 821 F.2d 968, 975 (4th Cir. 1987), *cert. denied*, 485 U.S. 934 (1988).

The defendants also do not dispute that venue for prosecution of a violation of 18 U.S.C. § 924(c) lies wherever there is venue for the underlying drug trafficking crime (or crime of violence) in furtherance of which the subject firearms are used or possessed.  App. Brf.  at 33-34; *see, e.g., United States v. Robinson*, 275 F.3d 371 (4th Cir. 2002).  In *Robinson*, this Court specifically held that a violation of 18 U.S.C. § 924(j) (now Section 924 (I), which, in turn, is based on Section 924(c)) could be brought in any district in which an essential element of the violation of Section 924 (c) occurred.  *See Robinson*, 275 F.3d at 378-79.  This Court has held that the underlying crime of violence or drug trafficking crime in furtherance of which firearms were used or possessed is an "essential element" of the Section 924(c) violation. Therefore, venue for the Section 924(c) violation lies wherever there is venue for the related offense, which in this case is wherever there is venue for the conspiracy charged in Count One.  *See Robinson*, 275 F.3d at 379.

The defendants argued that, because the conspiracy purportedly ended before the firearms were seized, there was no proof that the firearms were possessed in furtherance of the conspiracy.  App. Brf. at 333-34.  To establish a violation of 18

43

U.S.C. § 924(c) the Government must prove that the defendant possessed a firearm and that the firearm "furthered, advanced, or helped forward a drug trafficking crime." *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). Factors that might lead a reasonable trier of fact to conclude that the requisite nexus existed between the firearm and the drug offense include: "'the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon . . . , whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.'" *Id.* (*quoting United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir.2000)). "Ultimately, the test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of the firearm facilitated a drug trafficking crime . . . ; 'in furtherance' means that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005). To that end, a firearm might further or advance drug trafficking as a defense against someone trying to steal drugs or drug profits or as a deterrence to a robbery. *See Lomax*, 293 F.3d at 705.

44

To the extent that the defendant's argument is one alleging insufficiency of the evidence, an "appellate court's reversal of a conviction on grounds of insufficient evidence should be 'confined to cases where the prosecution's failure is clear.'" *United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984). To determine whether there was sufficient evidence to support a conviction, this Court considers whether, taking the evidence in the light most favorable to the Government, any reasonable trier of fact could have found the defendant guilty based on substantial evidence. *See Glasser v. United States*, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir.1996) (*en banc*).

Here, the evidence was sufficient to prove that the defendants possessed the firearms at issue in furtherance of the Maryland-related drug trafficking conspiracy, and venue in Maryland was therefore proper. The defendants cannot claim that they *withdrew* from the conspiracy, and there is likewise no legal or factual basis to conclude that the conspiracy had "terminated" by August 18, 2004. Like the Supreme Court, this Court has recognized that once a conspiracy is established it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. *See Hyde v. United States*, 225 U.S. 347, 369-70 (1912). The

45

burden of proving termination or withdrawal rests on the defendant. *See United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986). "Withdrawal must be shown by evidence that the former conspirator acted to defeat or disavow the purposes of the conspiracy." *United States v. Urbanik*, 801 F.2d 692, 697 (4th Cir. 1986). A mere cessation of activity in furtherance of the conspiracy, as has been alleged by the defendants, has been held to be insufficient to constitute termination or withdrawal. *See United States v. Goldberg*, 401 F.2d 644, 648 (2d Cir.1968), *cert. denied*, 393 U.S. 1099 (1969).

In *Joyner v. United States*, 547 F.2d 1199, 1203 (4th Cir. 1977), this Court addressed a defendant's claim that the conspiracy had "terminated" before certain statements the government sought to introduce were made. The Court disagreed and found that a lapse of time since the last overt act and the apparent completion of the conspiratorial objective ( selling drugs) did not necessarily terminate the conspiracy. *See id.* " Nevertheless, the law is clear that once a conspiracy is established, it is presumed to continue until its termination is affirmatively shown." *Joyner*, 547 F.2d at 1203. The *Joyner* Court further noted that, "the mere lapse of several *months* between the last overt act and the conversation did not in itself establish that the statements were made after the conspiracy ended." *Id.* (*quoting United States v. Blackshire*, 538 F.2d 569, 571 (4th Cir. 1976)).

46

It is also well settled, as the defendants correctly acknowledge, that the arrest of members of the conspiracy does not terminate the conspiracy. *See, e.g.*, *United States v. Urrego-Linares*, 879 F.2d 1234, 1240 (4th Cir. 1989); *United States v. Grubb*, 527 F.2d 1107, 1109 (4th Cir. 1975).

As demonstrated by Moore's orchestration of drug deals between Babb and Davita Bush from the Cecil County Detention center, the arrest of Moore in November 2003 did not terminate the conspiracy. At Moore's direction, Ms. Bush used her cell phones and those of others, such as Tamika Mills, to facilitate Moore's continued communication with Babb. Also, as detailed above, Moore also oversaw two drug and money transactions between Babb and Ms. Bush at 3615 Martin Avenue in late 2003 and early 2004. Moore and Babb also arranged two meetings at which Babb's cousin, Stanley Bryant, delivered money to Ms. Bush in New York. Also, aside from Davita Bush and Tamika Mills, who described Babb's ongoing drug trafficking activities at his Martin Street residence, Sheila Hooker testified that she delivered a large package of crack cocaine to Babb at 3615 Martin Avenue, meaning that the delivery must have occurred between November 2003 and August 2004. T-7:115-19.

47

The defendants assert that the conspiracy was "terminated" by the arrest of Davita Bush on July 14, 2004, after which, they claim, Babb did not have anyone with whom to conspire (overlooking that prison proved to be no impediment to Moore's continued criminal behavior). App. Brf. at 32-45. The discontinuation of contact between Babb and Ms. Bush for a month or so, however, did not "terminate" the conspiracy nor did it leave Babb with no one else to communicate with (or without any thing else to do) to further the conspiracy. For example, Porsha Harper, who was arrested with Moore on November 6, 2003, when the bodies of Ms. Withers and Robinson were discovered in the trunk of the Intrepid, was released on bail on the state charges in late December 2003. Following Harper's release and return to Greensboro, Babb was in frequent telephone and personal contact with her until August 17, 2004, when Ms. Harper was arrested on federal charges. While Ms. Harper is not believed to have had *prior* knowledge of the robbery and murders, she did know that Babb and Moore were involved in drug trafficking. Once the bodies were discovered, Ms. Harper knew that Babb and Moore were involved. Because Ms. Harper had seen Babb and Moore (and the Intrepid) on the evening of November 5, Harper could link Babb to Moore, to the Intrepid and to the Bellevue Avenue crime scene, thereby posing a unique threat to Babb. Because of Harper's knowledge, Babb called Harper *every day*, sometimes

48

several times, up to August 17, 2004.  T-V:105; 120-22.  Ms. Harper never

disclosed *any* information about Babb or the Bellevue crime scene until she became

a cooperating witness in late 2006, long after Babb was in federal custody.  Babb's

daily contact with Harper, which ended only when he was arrested, had only one

purpose – to ensure Harper's silence for the benefit of Babb and the conspiracy at

large.  *See United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) (statements in which

coconspirator instructed cooperating witness to remain quiet about meeting in

which defendant and coconspirator solicited witness to set fire to defendant's store

were made "in furtherance" of conspiracy, inasmuch as statements, which reflected

attempts to avoid detection, advanced conspiracy's goal).

That the conspiracy was still ongoing in August 2004 was further evidenced

by Babb's very possession of the firearms described in Count Seven.  Contrary to

the defendants' assertion that  "none of the evidence presented at the trial linked

any of the weapons recovered in North Carolina to the conspiracy alleged in the

indictment," App. Brf. at 34, several of these firearms *were* identified and linked to

Willie Robinson, who was described by everyone who knew him to be a drug

dealer.  Teresa Turner, Willie Robinson's one-time girlfriend, testified that several

of the recovered firearms were identical to firearms Robinson carried and sold to

others.  T-II:246-50.  Furthermore, Richard Ronta Jackson, Willie Robinson's drug

49

trafficking mentor and Babb's source of cocaine, testified that he knew Robinson to carry a 10mm Glock. As noted, Jackson identified a picture of a 10mm Glock recovered at Martin Avenue to be like the one carried by Willie Robinson. Whether or not any of the firearms had been Robinson's, the jury had a sufficient evidentiary basis to conclude that Babb's possession of the subject firearms were possessed at the Martin Avenue residence in relation to the drug trafficking conspiracy, since, after November 2003, that residence was the hub of the conspiracy. *See, United States v. Turner*, —F.3d— (4th Cir. 2008) 2008 WL 4482985 (evidence sufficient to convict for violation of Section 924(c) where firearms possessed in a residence in which transactions conducted by member of conspiracy who several witnesses described as drug dealer.)

The search of 3615 Martin Avenue also revealed that Babb was in possession of several cell phones that had been used throughout the conspiracy; records for these phones linked Babb to Jackson, Moore, Harper, Robinson, Withers and others. These phones were identified at trial by Sgt. Lozier. T-IX:114-20; 125-27. Babb was also in possession of records for a vehicle used by Robinson that had been registered in the name of Lashina Brooks, a friend of Ms. Withers. T-IX:127-28.

50

In light of the evidence, the defendants' claim that the conspiracy had "terminated" is not borne out by the facts that show that Babb and Moore continued to communicate with each other, to direct the sale of drugs, and to maintain cell phones, firearms and records utilized in the drug conspiracy. These facts indicate that the conspiracy was not "terminated" before Babb's arrest in August, 2004. More to the point, given their burden, nothing presented by the defendants supports a finding that the conspiracy had terminated. The jury therefore had a sufficient basis to conclude that the firearms seized on August 18, 2004, were possessed "in furtherance" of the conspiracy, in violation of 18 U.S.C. § 924(c).

## III.  THE DISTRICT COURT CORRECTLY DENIED THE DEFENDANTS' REQUEST FOR A JURY INSTRUCTION DEFINING "REASONABLE DOUBT."

### A.  Standard of Review.

The decision whether or not to give a jury instruction as well as the content of that instruction are reviewed for an abuse of discretion. *See United States v. Burgos*, 55 F.3d 933, 935 (4th Cir. 1995).

51

**B.    The District Court Was Correct to Not Instruct the Jury As To A Definition of "Reasonable Doubt."**

The defendants argue that the district court erred in denying their request for a jury instruction defining "reasonable doubt." However, as they correctly observe in their brief, this Court has held that a district court need not, and indeed is not permitted to, define the term "reasonable doubt." *United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998); *United States v. Reives*, 15 F.3d 42, 45 (4th Cir.1994) (noting that this Court has "consistently and vigorously condemned the attempts of trial courts to define reasonable doubt" unless requested to do so by the jury). The district court did not err.

**IV.    THERE WAS NO IMPROPER COMMUNICATION WITH THE JURY THAT REASONABLY AFFECTED THE INTEGRITY OF THE JURY'S VERDICT OR THAT REQUIRES REVERSAL OF THE DEFENDANTS' CONVICTIONS.**

The defendants next assert that the district court committed plain error by failing to *voir dire* the jury or declare a mistrial in response to what they allege, for the first time on appeal, to be improper contact between trial spectators and the jury. Because there has been no showing that there was any improper communication or that any alleged error affected their substantial rights, this purely speculative claim must fail.

52

## A.    Standard of Review.

Ordinarily, the "trial court's findings of juror impartiality may 'be overturned only for manifest error.'" *Mu'min v. Virginia*, 500 U.S. 415, 428-29 (1991) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)).  Because the defendants failed to preserve their claim that the district court erred in failing to question the jurors about allegedly improper communications with them, this Court's review is for plain error.  *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993).  In order to establish the Court's authority to notice an error not preserved by a timely objection, the defendants must show (1) that an error occurred, (2) that the error was plain, (3) and that the error affected his substantial rights.  *See Olano*, 507 U.S. at 732; *United States v. Cedelle*, 89 F.3d 181, 184 (4th Cir. 1996).  To establish the third prong, the defendants must demonstrate that the error was prejudicial, *i.e.*, that it "affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734.  Even if they can satisfy these requirements, correction of the error remains within the court's sound discretion, which it "should not exercise . . . unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732.

53

### B.    The Alleged "Contact" with the Jurors.

After the luncheon recess following the testimony of witness Davita Bush,

the court made the following statement out of the presence of the jury:

> Be seated. Counsel, there have been some regular attendees at this trial
> who I take it are family members, acquaintances of one or both of the
> Defendants.  It would appear that perhaps jurors believe too much
> attention is being paid to them. It's a rather unusual circumstance, but
> I've heard it before. Obviously, it's not unusual for participants in a
> trial to watch the jury, but we want to be sure that the jury is not made
> uncomfortable.
>
> So, if I'm correct that the regular attendees have been members of the
> family or friends of the Defendants, I would appreciate counsel
> commenting to them when and as appropriate that we don't want to
> make the jurors uncomfortable, and what's actually a lot more
> interesting about a trial is what goes on in the well of the court and
> from the witness stand as opposed to the jury. So I share that with you
> just so that you can convey the court's mild concern that the jurors not
> be made uncomfortable. It's nothing more than that. Okay?

T-VI:142.  That was the complete extent of the court's remarks on this issue.

Neither defense team inquired as to what prompted the court's remarks and neither

sought *voir dire* of the jury or of any particular juror.

### C.    The Defendants Have Failed to Establish Either that Extrajudicial
Contact  Occurred or that Any Such Contact Affected the Validity
of the Jury's Verdict.

The defendants' argument, that the district court plainly erred in not *sua*

*sponte* inquiring about jurors being intimidated by spectators, is meritless because

the record does not demonstrate that there was any contact between the spectators and the jurors.  The defendants have taken a general concern expressed by the district court, which they were unconcerned about at the time, and weaved from it a speculative, almost fanciful claim of intimidation.

The Sixth Amendment provides to each criminal defendant a right to a trial by an impartial jury.  *See  Reynolds v. United States*, 98 U.S. 145, 154 (1879).  As the Supreme Court has recognized, the trial judge is in the best position to make judgments about the "impartiality and credibility" of potential jurors based on the judge's "own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981).  *See also United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996) (determination of jury impartiality is committed to the good judgment of the trial judge).  For that reason, "[a] trial court's findings of juror impartiality may 'be overturned only for manifest error.'"  *Mu'min v. Virginia*, 500 U.S. 415, 428-29 (1991), quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (finding no error in trial judge's refusal to question prospective jurors about specific content of news reports).

Where there is "any private communication, contact, or tampering, directly or indirectly about the matter pending before the jury," there is a presumption of prejudice to the defendant.  *Remmer v. United States*, 347 U.S. 227, 230 (1954)

55

(remanding for hearing where juror who had been offered a bribe was investigated by an FBI agent during trial).  But, as this Court has noted, the presumption of prejudice that attaches to an impermissible communication is "not one to be casually invoked." *Stockton v. Virginia*, 852 F.2d 740, 745 (4th Cir. 1988).  For this reason, the rebuttable presumption of prejudice attaches only if the *defendant* meets his "initial burden of establishing both that the extrajudicial contacts occurred and that they were of such a nature as to reasonably cast doubt on the validity of the jury's verdict."  *Id.* at 747 (finding that defendant failed to meet his initial burden of showing that various alleged extrajudicial improper communications with several jurors during high profile murder trial occurred and, if so, that they were of such a nature as to reasonably cast doubt on the validity of the jury's verdict).  In this case, the defendant can establish neither that the contacts occurred nor that they were prejudicial.

In *Stockton*, and since, this Court has made clear that the defendant's initial burden to establish both an improper communication and its effect on the validity of the conviction is not an easy one to meet:

> Reversal is not required anytime a juror hears anything at all about a case.  Even the most scrupulous jurors may not be able to avoid overhearing all comment on a trial.  Jurors are not rendered "partial" simply because they become aware of the existence of negative community sentiment.  "'The safeguards of juror impartiality, such as

56

> voir dire and protective instructions from the trial judge, are not
> infallible; it is virtually impossible to shield jurors from every contact
> or influence that might theoretically affect their vote" [and] "due
> process does not require a new trial every time a juror has been placed
> in a potentially compromising situation. Were that the rule, few trials
> would be constitutionally acceptable."

*Stockton*, 852 F.2d at 746-47 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)

(declining to impute bias to a juror who applied for employment as an investigator

with the district attorney's office during the trial)). *See also Billings v. Polk,* 441

F.3d 238, 247, n.6 (4th Cir. 2006) (holding that defendant was not entitled to a

*Remmer* evidentiary hearing to explore potential prejudicial effect of alternate juror

wearing a T-shirt that said, "No Mercy-No Limits," which other jurors saw and

laughed at, since defendant failed to first establish that this "contact was of such a

character to reasonably draw into question the integrity of the verdict"); *Burch v.

Corcoran*, 273 F.3d 577, 591 (4th Cir. 2001) (juror reciting Bible verses during

deliberation in death penalty case was not improper communication and  defendant

failed to show that it created  reasonable possibility that the jury verdict was

influenced).

Because a defendant's initial burden is not an easy one, courts have

recognized that there is no ironclad requirement that individualized *voir dire* is

always necessary every time there is a suggestion of improper influence on the

57

jury.  As the Seventh Circuit has recognized,

> [n]ot every allegation of jury misconduct is sufficiently substantial or
> sufficiently well substantiated to warrant putting the jurors on the spot
> in this fashion.... Quizzing a juror, or perhaps all the jurors, in the
> middle of a trial is likely to unsettle the jury, and the judge is not
> required to do so unless there is a much stronger indication of bias or
> irregularity than there was here.

*United States v. Stafford,* 136 F.3d 1109, 1112-13 (7th Cir. 1998).

Here, as in this Court's decisions in *Stockton*, *Billings*, and *Burch*, the
defendants have failed to make even the initial showing that there was *any*
communication with the jury, much less an improper one.  The fact that spectators
may have been merely *watching* the jury – which, based on the court's remarks, is
the worst thing that may have occurred here – does not constitute jury intimidation
or contact. *Cf. United States v. Brown*, 923 F.2d 109, 111 (8th Cir. 1991) (finding
that claims of "physical closeness, stares, and rebuffed efforts at conversation" are
"neither unique nor uncommon to public trials and do not of themselves trigger the
*Remmer* presumption").  Here, the record reveals only that the court was concerned
with the comfort of the jury.  The defendants offer nothing beyond  speculation
about what might have prompted the court's general reminder to counsel.  At
bottom, although the district court here certainly (and properly) took precautions to
ensure that the jury was not "uncomfortable," nothing more about this issue was

said or done as to this matter for the remainder of the trial.  Thus, given the facts,

there is simply no indication that there was any significant or sustained effort by

anyone to interfere with the jurors.

Finally, even if there had been an improper communication, the defendants

fail to meet their burden of showing that such contact reasonably draws into

question the validity of the guilty verdict or that, under the plain error standard, the

alleged error "actually affected the outcome of the proceedings."  *United States v.*

*Hastings*, 134 F.3d 235, 240 (4th Cir. 1998)*.  See also Cedelle*, 89 F.3d at 186

("Central to this inquiry is a determination of whether, based on the record in its

entirety, the proceedings against the accused  resulted in a fair and reliable

determination of guilt.").   The defendants can point only to the fact of the guilty

verdict itself to support their speculative claim that the jurors were affected by

some otherwise unknown outside contact.  But the fact of the guilty verdict is not

enough, by itself, to establish prejudice under the plain error standard.  *Cf. United*

*States  v. Rolle*, 204 F.3d 133 (4th Cir. 2000) (defendant failed to show that actual

prejudice resulted from his absence during individual *voir dire* of 12 members of

prospective jury panel because defendant offered no more than mere speculation

that make-up of jury panel might have been different had he been present); *United*

*States v. Turcks*, 41 F.3d 893, 898 (3d Cir. 1994) (explaining that defendant's

burden on plain error review "is to show that the outcome of [the] trial was actually affected" by the error); *United States v. Miro*, 29 F.3d 194, 200 (5th Cir. 1994) (noting that in order to establish that an error affected substantial rights, the defendant ordinarily must "make a specific showing of actual prejudice.")

In sum, the defendants' claim, raised for the first time on appeal, that the guilty verdict was affected by some outside influence on the jurors is not supported by the record. This Court should conclude that the defendants have not met their burden of showing that there was any improper communication or that whatever "communication" might have occurred casts doubt on the validity of the guilty verdict. The convictions should be affirmed.

## CONCLUSION

For these reasons set forth above, the government respectfully submits that the defendants' convictions and sentences should be affirmed.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:    _____/s/_____
John F. Purcell
Assistant United States Attorney
District of Maryland
36 South Charles Street, 4th Floor
Baltimore, MD 21201

60

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the typeface requirements of Fed. R. App. 32(a)(5)

and the type style requirements of Fed. R. App. 32 (a)(6) because this brief

has been prepared in a proportionally spaced typeface,

**WordPerfect 9, Times New Roman, 14 Point**


2.      This brief complies with the type-volume limitation of Fed. R. App. 32 (a)(7)

(b) and contains 13,610 words, excluding the corporate disclosure statement;

table of contents; table of citations; statement with respect to oral argument;

any addendum containing statutes, rules, or regulations, and the certificate of

service.

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions.  If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.


_____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney


62

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing page-proof Brief of the Appellee was electronically filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit and that two copies of the foregoing Brief of the Appellee were mailed to the attorneys listed below on this 5th day of January, 2009:

William C. Brennan, Jr.                Joseph Murtha
William A. Brennan                    Miller, Murtha & Psoras LLC
Brennan, Sullivan & McKenna LLP    1301 York Road, Suite 108
6305 Ivy Lane, Suite 700             Lutherville, Maryland 21093
Greenbelt, Maryland 20770          Counsel for James Moore
Counsle for Walter Babb

_____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney