Record No. 07-4775 consolidated with Record No. 07-4776

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

—————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WALTER BABB

and

JAMES MOORE,

Defendant-Appellants.

—————————————————

**On appeal from the United States District Court for the District of Maryland (Northern Division)**

Hon. Andre M. Davis, Presiding with a jury

—————————————————

## BRIEF OF THE APPELLANTS

William C. Brennan, Jr.
William A. Mitchell, Jr.
BRENNAN SULLIVAN & MCKENNA LLP
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044
**Counsel for Walter Babb**

Joseph Murtha
MILLER MURTHA & PSORAS LLC
1301 York Road, Suite 108
Lutherville, Maryland 21093
(410) 583-6969
**Counsel for James Moore**

# TABLE OF CONTENTS

Table of Authorities ............................................................................. ii

Statement of Subject Matter Jurisdiction and Appellate Jurisdiction..................... 1

Statement of the Issues........................................................................ 2

Statement of the Case.......................................................................... 2

Statement of Facts ............................................................................. 5

Summary of the Arguments................................................................. 16

Argument

I.     The district court reversibly erred in denying the Appellants' request for a jury instruction on multiple conspiracies because (1) the evidence presented at trial demonstrated that the Appellants were involved only in separate conspiracies and (2) the Appellants were prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial. ...................... 18

II.    The District of Maryland was not the proper venue in which to prosecute Count Seven of the Third Superseding Indictment (possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c)) because the firearms were recovered in North Carolina and there was no conspiracy in Maryland in furtherance of which the firearms could have been possessed.................... 31

III.   The district court reversibly erred in denying the Appellants' request for a jury instruction on reasonable doubt because a criminal verdict based on a standard of proof less than reasonable doubt violates the due process clauses of the Fifth and Sixth Amendments of the United States Constitution. ................................................................. 35

IV.   The district court reversibly erred in failing to *voir dire* the jury upon learning that some jurors may have been intimidated by persons seated in the gallery (who were associated with the appellants) because third-party contact with a juror, whether direct or indirect, is presumptively prejudicial unless proven harmless beyond a reasonable doubt. ...................................................................................... 37

Conclusion ........................................................................................... 43

Request for Oral Argument ................................................................. 43

Certificate of Compliance .................................................................. 44

Certificate of Service .......................................................................... 44

ii

# TABLE OF AUTHORITIES

## Cases

*California v. Roy*, 519 U.S. 2 (1996)...................................................................... 37

*Francis v. Franklin*, 471 U.S. 307 (1985)............................................................. 35

*Gold v. United States*, 352 U.S. 985 (1957)......................................................... 39

*Holbrook v. Flynn*, 475 U.S. 560 (1986) .............................................................. 39

*Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1992)................................................ 39

*Hyde v. United States*, 225 U.S. 347 (1912) ........................................................ 32

*In re Murchison*, 349 U.S. 133 (1955) ................................................................. 38

*In re Winship*, 397 U.S. 358 (1970) ................................................................. 35-36

*Irvin v. Dowd*, 366 U.S. 717 (1961)................................................................. 37-38

*Jackson v. Virginia*, 443 U.S. 307 (1979)............................................................ 35

*Kotteakos v. United States*, 328 U.S. 750 (1946) ................................................ 19

*Leary v. United States*, 395 U.S. 6 (1969) ........................................................... 37

*Mattox v. United States*, 146 U.S. 140 (1892)..................................................... 38

*Owen v. Duckworth*, 727 F.2d 643 (7th Cir. 1984)............................................. 40

*Remmer v. United States*, 347 U.S. 227 (1954).......................................... 38, 39, 40

*Remmer v. United States*, 350 U.S. 377 (1956)................................................... 39

*Sandstrom v. Montana*, 442 U.S. 510 (1979)....................................................... 37

*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1998)............................................. 38

iii

*Strickland v. Virginia*, 852 F.2d 740 (4th Cir. 1988) ............................................ 39

*Stromberg v. California*, 283 U.S. 359 (1993) .................................................... 37

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ...................................................... 36

*Turner v. Louisiana*, 379 U.S. 466 (1965) ........................................................ 38

*United States v. Abushi*, 682 F.2d 1289 (9th Cir. 1982) ........................................ 23

*United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993) ............................................ 43

*United States v. Armstrong* 654 F.2d 1328 (9th Cir. 1981) ..................................... 39

*United States v. Banks*, 10 F.3d 1044 (4th Cir. 1993) ....................................... 19, 29

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) ....................................... 31

*United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000) ........................ 21-22, 29, 32

*United States v. Brantley*, 777 F.2d 159 (4th Cir. 1985) ................................... 32, 34

*United States v. Brown*, 923 F.2d 109 (8th Cir. 1991) .......................................... 40

*United States v. Ducktel*, 192 F.3d 893 (9th Cir. 1999) ........................................ 42

*United States v. Gaudin*, 515 U.S. 506 (1995) ................................................... 36

*United States v. Goldberg*, 401 F.2d 644 (2nd Cir. 1968) ...................................... 32

*United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001) ........................................ 40

*United States v. Howard*, 115 F.3d 1151 (4th Cir. 1997) ....................................... 18

*United States v. Johansen*, 56 F.3d 347 (2nd Cir. 1995) ....................................... 23

*United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981) ........................................ 23

*United States v. Kennedy*, 32 F3d 876 (4th Cir. 1994) .............................. 18, 21, 26

*United States v. Leavis*, 853 F.2d 215 (4th Cir. 1988) ....................................... 19, 27

*United States v. Lokey*, 945 F.2d 825 (5th Cir. 1999) ............................................ 23

*United States v. Norton*, 700 F.2d 1072 (6th Cir. 1983) .................................... 39, 41

*United States v. Nunez*, 432 F.3d 573 (4th Cir. 2005) ........................................ 19, 27

*United States v. Olano*, 507 U.S. 725 (1993) ......................................................... 37

*United States v. Oriakhi*, 57 F.3d 1290 (4th Cir. 1995) ......................................... 36

*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001) ...................................... 31

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ...................................... 31

*United States v. Romer*, 148 F.3d 359 (4th Cir. 1998) ..................................... 18, 35

*United States v. Rosnow*, 977 F.2d 399 (8th Cir. 1992) ....................................... 23

*United States v. Rutherford*, 371 F.3d 364 (9th Cir. 2004) .............................. 39, 42

*United States v. Smith*, 452 F.3d 323 (4th Cir. 2006) ...................................... 31-32

*United States v. Squillacote*, 221 F.3d 532 (4th Cir. 2000) ............................. 19, 29

*United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003) .................................. 22, 29

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) ........................................... 18

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ....................... 32

*United States v. Vasquez-Ruiz*, 502 F.3d 700 (7th Cir. 2007) ............................. 41

*United States v. Walker*, 796 F.2d 43 (4th Cir. 1986) .......................................... 32

*United States v. Wilson*, 262 F.2d 305 (4th Cir. 2001) ........................................ 31

## Constitutional Provisions & Statutes

U.S. Const. Amend. V ................................................................ 36

U.S. Const. Amend. VI ............................................................... 36

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 846 ...................................................................... 1, 2

18 U.S.C. § 924 (c) ........................................................... *passim*

18 U.S.C. § 924 (i) ..................................................................... 3

18 U.S.C. § 924 (o) ................................................................. 1, 3

18 U.S.C. §3742 ....................................................................... 2

28 U.S.C. § 1291 ...................................................................... 2

## STATEMENT OF SUBJECT MATTER JURISDICTION AND
## APPELLATE JURISDICTION

The Defendant-Appellant, Walter Babb, appeals from the final judgment of conviction and sentence entered on July 24, 2007. Mr. Babb timely noted an appeal thereof on July 24, 2004. Mr. Babb was convicted of conspiring to distribute and possess with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. § 846, conspiring to possess firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (o), and possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c).

The Defendant-Appellant, James Moore, appeals from the final judgment of conviction and sentence entered on July 24, 2007. Mr. Moore timely noted an appeal thereof on August 1, 2007. Mr. Moore was convicted of conspiring to distribute and possess with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. § 846, conspiring to possess firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (o), two counts of using of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924 (c), and possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c).

The United States District Court for District of Maryland was a court of original subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The United States

1

Court of Appeals for the Fourth Circuit has over jurisdiction over this appeal
pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.      Did the district court reversibly err in denying the Appellants' request for a
jury instruction on multiple conspiracies?

II.     Did the district court reversibly err in denying the Appellants' motion to
dismiss for improper venue and subsequent motion for judgment of acquittal
as to Count Seven of the Third Superseding Indictment?

III.    Did the district court reversibly err in denying the Appellants' request for a
jury instruction on reasonable doubt?

IV.     Did the district court reversibly err in failing to *voir dire* the jury upon
learning that some jurors may have been intimidated by persons seated in the
gallery who were associated with the Appellants?

## STATEMENT OF THE CASE

**I.      The Indictment**

On April 6, 2006, the Grand Jury sitting in the United States District Court
for the District of Maryland issued a Third Superseding Indictment charging Mr.
Babb and Mr. Moore as follows: (Count One) conspiracy to distribute and possess
with intent to distribute five kilograms or more of cocaine and fifty grams or more
of cocaine base in violation of 21 U.S.C. § 846; (Count Two) conspiracy to possess

2

firearms in furtherance of a drug trafficking crime of 18 U.S.C. § 924 (o); (Count

Three) use of a firearm during and in relation to a drug trafficking crime in

violation of 18 U.S.C. § 924 (c); (Count Four) use of a firearm during and in

relation to a drug trafficking crime in violation of 18 U.S.C. § 924 (c); (Count

Five) use of a firearm to commit murder during and in relation to a drug trafficking

crime in violation of 18 U.S.C. § 924 (i); (Count Six) use of a firearm to commit

murder during and in relation to a drug trafficking crime in violation of 18 U.S.C.

§ 924 (i); (Count Seven) possession of firearms in furtherance of a drug trafficking

crime in violation of 18 U.S.C. § 924 (c).

## II.    Trial and Verdicts

On April 2, 2007, Mr. Babb and Mr. Moore appeared for a jury trial (Hon.

Andre M. Davis, presiding), which concluded on April 19, 2007. At the close of

the evidence, the government moved to dismiss counts Five and Six as to both

defendants. As to Mr. Babb, the jury returned verdicts of guilty on counts One,

Two, and Seven, but could not reach a verdict as to Count Three and Count Four.

Those counts were later dismissed upon the government's motion. As to Mr.

Moore, the jury returned verdicts of guilty as to counts One, Two, Three, Four, and

Seven.

3

**III.     Sentencing and Appeals**

On July 24, 2007, both defendants appeared for sentencing. The district court sentenced Mr. Babb as follows: a period of life as to Count One; a period of 240 months as to Count Two, to be served concurrently to Count One; a period of sixty months, as to Count Seven, to be served consecutively to counts One and Two. The court also ordered ten years of supervised release and imposed a special assessment of $300.00 for all counts. Mr. Babb timely noted this appeal on July 24, 2007.

The district court sentenced Mr. Moore as follows: a period of life as to Count One; a period of 240 months as to Count Two, to be served concurrently with Count One; a period of 120 months as to Count Three, to be served consecutively to Count One; 120 months as to Count Four, to be served consecutively to Count Three; 300 months as to Count Seven, to be served consecutively to Count Three. The court also ordered ten years of supervised release and imposed a $300.00 special assessment and a $50,000.00 fine. Mr. Moore timely noted this appeal on August 1, 2007.

## STATEMENT OF FACTS

I.    **The Defendants and witnesses were acquainted in New York and moved to North and South Carolina over the years.**

James Moore, Devita Bush, Willie Robinson, and Barbara Haynes were acquaintances in New Rochelle, NY in the 1990's and early 2000's. Richard Jackson testified that he had met Mr. Robinson in the mid 1980's when he visited New Rochelle. (JA 469-470). When Mr. Robinson moved to Danville, Virginia in 1995, Mr. Jackson provided him with crack for distribution. Mr. Jackson testified that, at that time, he was selling roughly five to six kilograms of cocaine each week to various buyers, and three ounces of crack each week to Mr. Robinson. (JA 476-478). He taught Mr. Robinson how to cook cocaine into crack, transport it, and sell it. (JA 486). According to Teresa Tyler, Mr. Robinson was known to possess numerous guns (JA 436, 443). Mr. Robinson made approximately $12,000 to $15,000 at his convenience store. (JA 444).

Mr. Jackson also testified that he was acquainted with Mr. Babb, because both of them used to deal drugs. (JA 492). Mr. Babb was incarcerated for a period of time but, upon his release, he began purchasing roughly nine ounces of crack from Mr. Jackson twice each week. (J A 494). Mr. Jackson testified that Mr. Babb operated his own crack house in Greensboro, (JA 495) and that Mr. Jackson occasionally visited it to deliver drugs to Mr. Babb. (JA 498). By the time Mr.

5

Jackson was arrested in early 2003, Mr. Babb was buying half a kilogram of crack

from him each time for roughly $12,000.00. This happened roughly twice per

week. (JA 498).

Devita Bush testified that she and Mr. Moore used to sell drugs together in

New Rochelle until they moved to Andrews, South Carolina in September 2002.

(JA 787). She testified that Mr. Robinson brought a small amount of crack to their

home on July 4, 2003 for Mr. Moore to sell. (JA 596).

**II.    Mr. Moore allegedly (1) took a trip to El Paso, Texas in August, 2003, (2) quickly returned to South Carolina, (3) later returned to El Paso, and (4) then came back to North Carolina with Mr. Babb and Ms. Withers.**

According to Ms. Bush, in August, 2003, Mr. Moore took a bus to El Paso,

Texas and was gone about a week. He told her he was going to meet Ray Sanchez,

whom Mr. Moore had said he met in jail and who had promised to sell him cocaine

on "consignment."  Ultimately, the deal was unsuccessful and Mr. Moore returned

to South Carolina without drugs in August, 2003. (JA 801).  In September, 2003,

Bush left Mr. Moore and moved back to New Jersey. (JA 802).

Trial testimony suggested that another trip to El Paso took place in late

October 2003, this time including Mr. Moore, Mr. Babb, Mr. Robinson, and

Alexandria Withers. Adrian Williamson testified that Mr. Babb asked him to watch

Mr. Babb's house in Greensboro because Mr. Babb was taking a trip to Mexico.

6

(JA 758). Mr. Williamson testified that Mr. Babb left for Mexico in a black Dodge Intrepid with a man named "R.D." (identified as Robinson) and a woman named Alexandria Withers, and was gone on that trip for roughly a week. (JA 758-759). During the time Mr. Babb was gone, Mr. Babb's sometime-girlfriend, Porsha Harper, came over to assist with the house-sitting. Ms. Harper testified that, during this time, Mr. Babb called her from Mexico and explained that he was having an issue at the border and was unable to call her back. (JA 619). Ms. Withers' roommate, Contrita Johnson, also testified that Ms. Withers called her several times during this trip.  Barbara Hayes testified that Mr. Robinson, the father of her children, had called her from Texas because his Intrepid had apparently broken down.  (The Intrepid had originally been owned by Ms. Hayes, and although Robison had taken over the payments, they had not officially changed the title.) Mr. Robinson asked Ms. Hayes if he could use her credit card number to rent another vehicle. (JA 367). Over a defense objection on the basis of hearsay, Ms. Hayes testified that Mr. Robinson told her that he was with "Fat James," whom he was trying to assist in getting back to Danville, Virginia. (JA 367). Ms. Hayes identified Mr. Robinson's number from Mr. Babb's phone records. (JA 371).

        Ms. Bush further testified that Mr. Moore called her from Texas on both Ms. Withers' and Mr. Babb's phones, (JA 807), although she had never met Mr. Babb. (JA 809). Mr. Moore had told her that the plan for the trip was to connect Mr.

Robinson to Ray Sanchez' supplier and make a $5,000.00 profit for each kilogram. (JA 812-813). Apparently, upon Mr. Robinson's arrival with the cash for the deal, Mr. Sanchez did not have the drugs and instead connected him with another supplier who would ship the drugs directly to North Carolina. (JA 815). Mr. Moore told Ms. Bush that Mr. Robinson had given him half the money for the drugs and was going to give him the balance once the drugs were delivered. (JA 816). Mr. Moore then told Ms. Bush that he was going back to North Carolina. (JA 819).

According to Mr. Williamson, when Mr. Babb, Mr. Robinson, and Ms. Withers returned, Mr. Moore was with them. (JA 762). Ms. Harper testified that Mr. Moore had been in Mexico for several months, had established a "connection" there (JA 642), and that Babb told her he was going to switch to that supplier. (JA 647). However, shortly after that discussion, Mr. Babb allegedly explained to Ms. Harper that he was no longer interested in not "doing the right thing." (JA 648).

On October 30, 2003 (also according to Ms. Bush), Mr. Moore told her that he was going to be staying in Greensboro, North Carolina with Mr. Babb where "They were waiting for the rest of the drugs to be delivered and for Round Head to give him the rest of his money." (JA 823). Mr. Babb told Ms. Bush that Mr. Moore was upset with Mr. Robinson because Mr. Robinson was not giving Mr. Moore the amount of money to which he thought he was entitled. Mr. Babb then told Bush that "he had explained to James that it wasn't Round Head's money for him to be

8

giving to him, so he was not the big man. It wasn't his money to be dishing out like that."(JA 824). He further told Bush that "the big man sent him [to El Paso] to watch over his money." (JA 824). Ms. Bush would somehow later learn that the "big man" was Richard Jackson, and that the money Mr. Robinson possessed actually belonged to Mr. Jackson. (JA 830). Ms. Bush further testified that Mr. Moore told her that, with the money, he intended to come get her and the kids and buy them a house. (JA 825).

**III.  On November 5, 2003, Mr. Babb and Ms. Harper were stopped by the Maryland State Police in Cecil County, Maryland on their way from North Carolina to New York. The troopers searched the car they were driving and, in the trunk, found the corpses of Ms. Withers and Mr. Robinson.**

On about November 5, 2003, Mr. Moore called Ms. Harper and asked her if she would like to go to New York. (JA 649). Ms. Harper was excited about the trip because she had never been to New York, and the plan was for her to drive Mr. Moore. (JA 649-650). At about 1:20 a.m. on November 6, Mr. Moore called her and said he was on his way over. Shortly after that call, Mr. Babb, a man Ms. Harper knew as "Tone Capone" (actually "Anthony McCormick"), and Mr. Moore arrived at Ms. Harper's apartment in two vehicles, one of which was the Intrepid. (JA 659). At that time, the men told Ms. Harper that Mr. Babb would not be going on the trip as she had expected. (JA 652, 662). Ms. Harper got in the driver's seat

9

of the Intrepid while Mr. Moore sat in the passenger seat. Mr. Babb and Mr. McCormick left in another car. (JA 666).

According to Ms. Harper, on the way to New York, Mr. Moore said that he was the "connect" in Mexico for New York and that there was $300,000.00 in the car with him. (JA 667). He then gave her $2,000.00 in cash, which she put in her boot. (JA 668). After passing Washington, D.C., Ms. Harper complained of her feet being sore and Mr. Moore took over driving. (JA 672).

On November 6, 2003 at approximately 10:00 a.m., the pair was stopped by a Maryland state trooper on I-95 in Cecil County, Maryland for driving seventy-four miles per hour in a sixty-five mile per hour zone. Ms. Harper was able to supply an identification card with her name and an insurance card with the name Barbara Hayes (JA 83). Mr. Moore was unable to produce a driver's license. A pat-down revealed roughly $1,000.00 in Mr. Moore's pocket. Becoming suspicious, the investigating trooper (Corporal Cameron) returned to his cruiser and called for backup. (JA 70). Troopers First Class Conner and Spinner responded. (JA 72).

Trooper Conner approached the passenger window of the Intrepid and spoke with Ms. Harper, who was supposedly visibly shaking. While talking with Ms. Harper, the trooper noticed that a lot of clothing was piled in the back seat of the car and was curious why it was not stored in the trunk. (JA 108). He asked Ms.

10

Harper if she had any clothes in the trunk and she responded: "Yeah. Do you want to look?" The trooper, of course, said "Yes." (JA 109). Ms. Harper then got out of the car and asked Mr. Moore where the keys were located. He told her they were still in the car. She retrieved them, made her way to the trunk, and opened it. (JA 109).

Inside, the troopers saw the outlines of two corpses situated in a spooning position, wrapped in a cover, and tied with rope. When asked about the bodies, Mr. Moore said that he did not know anything because it was not his car. The troopers cuffed both the driver and Ms. Harper. (JA 110). Ms. Harper would later testify that she had had no idea what was in the trunk. (JA 675).

At the station, the officers searched Mr. Moore further and recovered roughly $2,267 in cash, a $300.00 money order from Greensboro, North Carolina made payable to Devita Bush in Riverside, New Jersey, and a piece of paper with phone numbers on it. (JA 157). Some of the cash had what the officer believed to be blood on it. (JA 161). Mr. Moore stated that there was a duffle bag in the Intrepid with over $100,000.00 in cash in it. (JA 163).

A search of the Intrepid revealed that the bodies were wrapped in a comforter and plastic bags, tied, and further covered with a shower curtain liner that was smattered with blood. (JA 228-232). The male victim was later determined to be Willie Robinson (aka "R.D.", "Walter Moses," and

11

"Roundhead") (JA 339). The female victim was determined to be Alexandria Withers. (JA 339). Both victims had been shot to death. Multiple fingerprints were lifted from the plastic bags taken from bodies and found to match Mr. Moore. (JA 448). There were no prints recovered from the shower liner, but a trash bag recovered from the trunk had numerous prints that matched Mr. Moore. (JA 451). Money wrappers recovered from the car had the prints of both Mr. Robinson and Mr. Moore on them (JA 456). There were no prints lifted that matched those of Mr. Babb. (JA 464).

Also obtained from the search were two gas cans, a duffle bag with clothes in it, and shell casings. (JA 277-278). Some of the clothes recovered from the passenger compartment of the car had blood on them, including a Charlie Brown t-shirt recovered from a green backpack. (JA 299-303). The blood on the t-shirt was analyzed and found to match that of Mr. Robinson. (JA 1060).

Also obtained from the search were the following items: (1) an express mail receipt from James Moore in Andrews, South Carolina to Devita Bush on September 15, 2003, (2) an express mail receipt from James Howard in Danville, Virginia to Barbara Hayes in New Rochelle, New York on October 1, 2003, (3) a mobile phone and two pagers, (4) maps from Danville, Virginia to El Paso, Texas in a secret compartment, (5) a woman's boot with $2,000.00 inside, (6) a calendar, recovered from the green backpack, with a number written on it that would later be

12

determined to be that of Mr. Babb, and (7) a pen with the inscription of Ray Sanchez's auto-repair business in El Paso, Texas in the Charlie Brown t-shirt. (JA 310-327).

At trial, Ms. Harper testified that she recognized the comforters and shower curtain found in the trunk as having once been in Mr. Babb's house (JA 678-679). Mr. Williamson testified that, several days after hearing that R.D. had been killed, Mr. Williamson returned to Mr. Babb's house. (JA 766) and noticed a new sofa and a love seat, new decorations and shower curtain in the bathroom, and a new carpet in the kids' room. (JA 768).

## IV. Following the Arrest of Mr. Moore and Ms. Harper, Mr. Babb allegedly began providing cash and drugs to Ms. Bush.

Ms. Bush testified to being a party to several phone calls between Mr. Babb and Mr. Moore, following Mr. Moore's arrest, in which Mr. Moore explained that Mr. Babb would provide her with money while Mr. Moore was in jail. In fact, she threatened to provide the Maryland State Police and federal law enforcement authorities with information about Mr. Babb if he did not give her money. (JA 910).

According to Ms. Bush, Mr. Babb wired her between $500.00 and $800.00 every three days for the initial period of time in which Mr. Moore was detained in Cecil County, telling her that the money was Mr. Moore's. (JA 833). According to

Ms. Bush, Mr. Babb had associates of his in the Bronx drop $10,000.00 in cash off to her as well. (JA 834). She also testified that Mr. Babb sent her another $5,000.00 for Mr. Moore's lawyer, but that she spent half of it on herself. (JA 841-843).

Eventually, Mr. Babb complained that a federal investigation taking place in North Carolina –resulting from Mr. Moore's arrest– had curtailed his ability to sell drugs. Thus, Mr. Babb was unable to continue sending money to Bush. As a result, she took a bus from New York to North Carolina with the purpose of picking up drugs instead. (JA 845). Once there, Ms. Bush met Mr. Babb and his girlfriend, Tonya, at a bus stop in Greensboro. (JA 846). The three of them went to Tonya's house. (JA 847). Ms. Bush then testified that Mr. Babb retrieved 200 grams of crack cocaine from the ceiling, put it in a gym bag, and gave them to her. (JA 849). Ms. Bush's intention was to return to New York to sell it, but instead she decided to go to Maryland. (JA 850). Ultimately, with the help of two acquaintances she had made in Cecil County, Ms. Bush sold about half of the crack. She smoked the other half. (JA 855-856).

Ms. Bush also testified to forwarding several calls from the Cecil County Detention Center to Mr. Babb, again going to North Carolina, and getting a small amount of cocaine and $200.00 from Mr. Babb. (JA 859-865). Ms. Bush testified that she never saw any guns in Mr. Babb's house. (JA 870). After returning to

14

Maryland, Ms. Bush learned that federal authorities were investigating her

whereabouts. She fled back to New York and was arrested on July 14, 2004

pursuant to an indictment issued by the grand jury sitting in the District of

Maryland. (JA 874). The government provided no evidence of communication

between Mr. Moore, Mr. Babb, and Ms. Bush after her arrest on July 14, 2004. (JA

1174).

**V.    After the arrest of Devita Bush, there was no communication among the parties. Mr. Babb was arrested in Greensboro, North Carolina on August 16, 2008 and the police searched his home as well as the home of Ms. Martin.**

On August 16, 2004, nine months after Mr. Moore's arrest, officers from the

Greensboro Police Department executed an arrest warrant for Mr. Babb at the

home of Tonya Martin at 3615 Martin Avenue, Greensboro, North Carolina. Two

days later, the officers executed a search warrant at that address and recovered two

assault rifles located in the attic. (JA 1048). Found about two feet away from the

rifles was a bag containing an identification card bearing the name Walter Babb.

(JA 1051). Also recovered were a scale, a Glock pistol, and some ecstasy pills. (JA

1056).

The case proceeded to trial on a Third Superseding Indictment charging Mr.

Babb, Mr. Moore, and Ms. Harper with conspiracy to distribute and possess with

intent to distribute five kilograms or more of cocaine and fifty grams or more of

15

cocaine base, conspiracy to possess firearms in furtherance of a drug trafficking crime, two counts of use of a firearm during and in relation to a drug trafficking crime (for the murders of Willie Robinson and Alexandria Withers), two counts of use of a firearm to commit murder during and in relation to a drug trafficking (for the murders of Willie Mr. Robinson and Alexandria Ms. Withers), and possession of firearms in furtherance of a drug trafficking crime (for the weapons recovered during the search of the house on Martin Avenue).

On April 18, 2006, the district court held a hearing on the defendants' motion to dismiss for improper venue. The motion was held *sub curia* and was later denied. On September 15, 2006, the district court held a hearing on Mr. Moore's motion to suppress evidence obtained from the search of the Dodge Intrepid. The court denied the motion to suppress and the Appellants do not raise that issue in this Court. Prior to trial, Ms. Harper pled guilty to one count of obstructing justice and testified for the government.

## SUMMARY OF THE ARGUMENTS

I.   The district court reversibly erred in denying the Appellants' request for a jury instruction on multiple conspiracies because (1) the evidence presented at trial demonstrated that the Appellants were involved only in separate conspiracies and (2) the Appellants were prejudiced by the variance between

the single conspiracy charged in the indictment and the multiple conspiracies proven at trial.

II.   The District of Maryland was not the proper venue in which to prosecute Count Seven of the Third Superseding Indictment (possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c)) because the firearms were recovered in North Carolina and there was no conspiracy in Maryland in furtherance of which the firearms could have been possessed.

III.  The district court reversibly erred in denying the Appellants' request for a jury instruction on reasonable doubt because a criminal verdict based on a standard of proof less than reasonable doubt violates the due process clauses of the Fifth and Sixth Amendments of the United States Constitution.

IV.   The district court reversibly erred in failing to *voir dire* the jury upon learning that some jurors may have been intimidated by persons seated in the gallery (who were associated with the appellants) because third-party contact with a juror, whether direct or indirect, is presumptively prejudicial unless proven harmless beyond a reasonable doubt.

17

# ARGUMENT

**I. THE DISTRICT COURT REVERSIBLY ERRED IN DENYING THE APPELLANTS' REQUEST FOR A JURY INSTRUCTION ON MULTIPLE CONSPIRACIES BECAUSE (1) THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATED THAT THE APPELLANTS WERE INVOLVED ONLY IN SEPARATE CONSPIRACIES AND (2) THE APPELLANTS WERE PREJUDICED BY THE VARIANCE BETWEEN THE SINGLE CONSPIRACY CHARGED IN THE INDICTMENT AND THE MULTIPLE CONSPIRACIES PROVEN AT TRIAL.**

## A.    Standard of Review & Applicable Procedure

The district court's denial of a requested jury instruction is subject to review by this Court for abuse of discretion. *United States v. Romer*, 148 F.3d 359, 843 (4th Cir. 1998). A jury instruction on multiple conspiracies "may be required, as may instructions on specific defense theories generally, if sufficiently supported by the evidence." *United States v. Tipton*, 90 F.3d 861 883 (4th Cir. 1996). In failing to provide such an instruction, the district court will be held to have erred reversibly if "the defendants demonstrate that they have been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial." *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994); *United States v. Howard*, 115 F.3d 1151, 1157 (4th Cir. 1997). "A multiple-conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *Kennedy*, 32 F.3d at 884.

18

**B.     Substantive Law on Single & Multiple Conspiracies**

"The focus of a conspiracy is the single-mindedness to achieve a particular goal." *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005). "Often, the single conspiracy is comprised of a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." *Id*. (citing *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) (internal quotations omitted)). Therefore, "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *Banks*, 10 F.3d at 1053. "A single conspiracy exists where there is one overall agreement, or one general business venture. Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988).

*Kotteakos v. United States*, 328 U.S. 750 (1946), involved a conspiracy to fraudulently procure loans under the National Housing Act. The common actor in all of the fraudulent procurements essentially acted as broker in obtaining the loans with knowledge that they were not going to be used for the purpose for which they were authorized. The indictment in that case alleged thirty-two members of a single conspiracy involving numerous fraudulent loan transactions. Many of the

defendants had no contact with any of the other defendants, but all participated

with the same general purpose (to obtain money by defrauding the government)

through one common defendant (the loan broker). *Id*. at 752-756. The Court held

that the jury instruction as to one conspiracy between all defendants was reversible

error because the evidence showed that there were numerous separate conspiracies,

and, therefore, it impermissibly permitted the jury to impute the acts each

defendant to another defendant without proof that one common criminal scheme

existed. *Id.* at 769-772.

The case of *United States v. Squillacote*, 221 F.3d 532 (4th Cir. 2000),

involved the prosecution of a husband and wife for conspiracy to transmit

information relating to the national defense. The evidence presented at trial showed

that Squillacote's husband, Stand, was originally recruited and trained by the

foreign intelligence branch of East Germany's intelligence agency, the

Ministerium fur Staatssicherheit ("MfS"). Stand, in turn, recruited Squillacote and

Clark. The three received training abroad that was financed by the MfS, and all

kept in contact with the MfS through the same methods. Each of the three, over the

course of many years, was able to gain access to sensitive United States

government positions. When the Berlin Wall fell, the three conspirators remained

committed to their original recruiter, who expanded their contact to include the

Russian KGB. Stand assisted Squillacote in generally smuggling classified

20

documents and providing them to their foreign contact. When an investigation

began on the three conspirators, an undercover agent approached one of them. He,

in turn, put the other two in contact with the agent. *Id.* at 548-552, 574.

On these general facts, this Court found no error in the district court's

refusal to provide the jury with an instruction on multiple conspiracies. "A multiple

conspiracy instruction is not required unless the proof at trial demonstrates that

appellants were involved *only* in separate conspiracies *unrelated* to the overall

conspiracy charged in the indictment." *Id.* at 574 (quoting *United States v.

Kennedy*, 32 F.3d 876, 884 (4th Cir. 1988) (internal quotations omitted and

emphasis in the original)).

In *United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000), the appellant

argued that the evidence admitted at trial demonstrated multiple conspiracies,

because there were several "distributor groups" in multiple regions (including

Richmond and North Carolina) with competing interests that precluded a finding

that they were joined in one conspiracy. Moreover, argued the appellant, he stole

proceeds from other groups in a different state and, therefore, he was at odds with

them. *Id.* Finally, the appellant noted that he was totally uninvolved in any

distribution operations in Richmond and was not involved in a large conspiracy

that included Richmond. *Id.* at 308. This Court rejected these arguments:

21

The government…proved that the Poison Clan was a large crack distribution ring, led by Beckford, that operated up and down the East coast, including in Richmond. And Bowens had a hand in most of what Beckford did. Bowens was intimately involved in the leadership of the Poison Clan. He and Beckford referred to each other as "partners," and Bowens was described as Beckford's surrogate and as a member of "the inner circle." At one point, Bowens was dispatched to set up a crack distribution operation in South Carolina. Bowens was also Beckford's counselor and confidant, advising him to flee New York when Beckford became "hot." He arranged a hiding place for Beckford so that when Beckford evaded capture the first time, their drug partnership was able to continue. Bowens provided Beckford with a falsified South Carolina vehicle registration and a phony New Jersey driver's license. While Beckford hid out in the Carolinas, he and Bowens continued to run the drug ring together, arranging the delivery of powder cocaine, cooking the powder into crack, distributing the crack to dealers, and sharing equally in the proceeds. When Beckford finally was arrested, Bowens said he wanted to "keep the operation going." Other factors also linked the Poison Clan's various distribution units, including those in the Carolinas where Bowens devoted much of his efforts. The several contingents of the Clan used common methods of operation…They also had common participants…and common leadership and direction…Rather than showing multiple conspiracies, the evidence showed that the members of the Poison Clan, including Bowens, were linked by a "mutual interest in sustaining [one] overall enterprise," an enterprise based on a single conspiracy. Because the evidence did not support the existence of multiple conspiracies, the district court did not err in refusing to instruct the jury on this subject.

*Id.* at 307-308 (internal citation omitted).

In *United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003), the evidence admitted at trial demonstrated the existence of a heroin-distribution ring in Park Heights, Baltimore beginning in 1994 and continuing through 2000. The defendant in that case had been arrested and incarcerated in 1994 and was then released in

22

1999. At the conclusion of the trial, the defendant requested a jury instruction on multiple conspiracies, which the district court refused. The Fourth Circuit affirmed the district court's decision, finding that the distribution conspiracy had continued from 1994 through 1999 and that the defendant had merely "rejoined" upon his release from jail: "[T]he evidence at trial showed rather compellingly that one, and only one, enterprise controlled the distribution of heroin in the Park Heights neighborhood of Baltimore from 1994 through 1999, and that it operated as one continuous business enterprise. Elijah Jacobs testified at trial that Rolando Stockton was involved in the conspiracy before he went to jail in 1994, and that he rejoined upon his release in 1999." *Id*. at 762.

Other circuits addressing this issue have held that a multiple-conspiracy instruction is required where the evidence permits the jury to find that *either* one overall conspiracy existed *or* multiple conspiracies. *See, e.g., United States v. Johanson*, 56 F.3d 347 (2nd Cir. 1995), *United States v. Lokey*, 945 F.2d 825 (5th Cir. 1991), *United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981), *United States v. Rosnow*, 977 F.2d 399 (8th Cir. 1992), and *United States v. Abushi*, 682 F.2d 1289 (9th Cir. 1982).

## C.    Relevant Facts

Count One of the indictment in this case alleges a single conspiracy:

> From on or about September 2002 until on or about August 18, 2004, within the State and District of Maryland, the Middle District of North Carolina, and elsewhere [the defendants] did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other and with other persons, known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute and possess with intent to distribute five or more kilograms or more of a mixture or substance containing a detectable amount of cocaine, and fifty grams or more of a mixture or substance containing a detectable amount of cocaine base, commonly called "crack cocaine"…

(3SI: ¶ 1). Per the indictment, the object of the conspiracy was to obtain and distribute cocaine and crack cocaine with the intent to distribute them for money. (*Id.* at ¶ 2).

Richard Jackson testified that, when Mr. Robinson moved to Virginia in 1995, Mr. Jackson provided him with crack to sell.  He testified that he taught Mr. Mr. Robinson how to cook cocaine into crack, transport it, and sell it. (JA 486). He further testified that he was acquainted with Mr. Babb because both of them used to deal drugs and that, upon Mr. Babb's release from jail in 2002, he began purchasing roughly nine ounces of crack from Mr. Jackson twice each week. (JA 494). As of early 2003, Mr. Babb was buying half a kilogram of crack from him each time for roughly $12,000.00. (JA 498). Separately, according to Ms. Bush, she and Mr. Moore moved to South Carolina in September 2002 . She testified that Mr. Robinson brought a small amount of crack to their home on July 4, 2003 for Mr. Moore to sell. (JA 789).

24

Also according to Ms. Bush, Mr. Moore went to Texas on a bus in August, 2003 with the purpose of obtaining cocaine from Ray Sanchez. There was no evidence that either Mr. Babb or Ms. Withers were with him or involved in any way. He was unsuccessful and returned to South Carolina empty-handed. (JA 801). Then, in late October, 2003, Mr. Babb, Mr. Moore, Ms. Withers, and Mr. Robinson were all in Texas together, though it is not clear how they each came to be there. Mr. Babb, Mr. Moore, and Ms. Withers returned to North Carolina together. The government was unable to produce much evidence as to Mr. Babb's purpose on the trip, but Ms. Bush testified that Mr. Babb told her that "the big man sent him [to El Paso] to watch over his money." (JA 631). Mr. Jackson, however, denied any involvement in the El Paso matter. (JA 572).

Ms. Bush also testified that Mr. Moore had told her that the plan for the trip was to connect Mr. Robinson to Ray Sanchez's supplier and make a $5,000.00 profit per kilogram. (JA 812-813).  According to Ms. Bush, Mr. Moore then told her that he was going back to North Carolina. (JA 819). On October 30, 2003, according to Ms. Bush, Mr. Moore told her that he was going to be staying in Greensboro, North Carolina with Mr. Babb where "They were waiting for the rest of the drugs to be delivered and for Round Head to give him the rest of his money." (JA 823).

25

The next event for which the government admitted evidence was the trip to New York that ultimately ended with Mr. Moore and Ms. Harper's arrest in Maryland. Ms. Bush testified that, after the arrest, she connected several calls between Mr. Babb and Mr. Moore in which Mr. Moore explained that Mr. Babb would provide her with money while Mr. Moore was detained in Cecil County. The government also submitted evidence of numerous phone calls between Mr. Babb's phone and the Cecil County Detention Center. Also according to Bush, Mr. Babb wired her between $500.00 and $800.00 on numerous occasions, telling her that the money was Mr. Moore's. (JA 833).

Still also according to Ms. Bush, she traveled to North Carolina, obtained 200 grams of crack from Mr. Babb, and was to return to New York to sell it. She instead decided, *sua sponte*, to go to Maryland. There, she sold some of the crack and smoked the rest. Following a second trip to North Carolina, Ms. Bush learned that she was under investigation and she returned to New York. She was arrested on July 14, 2004. The Government provided no evidence of, nor does the government allege, any phone calls or other communications among any of the participants after her arrest.

At the charge conference following the close of the evidence, the Appellants requested that the district court instruct the jury as to multiple conspiracies. The district court denied that request. (JA 1182-1186).

26

**D.    Argument**

While the indictment in this case alleges a single conspiracy lasting from September 2002 to August 2003, the evidence presented at trial demonstrates that the Appellants were individually involved in a separate series of conspiracies unrelated overall conspiracy charged in the indictment. *See Kennedy*, 32 F.3d at 884 (denial of a request for a multiple-conspiracy instruction is reversible error if "the defendants demonstrate that they have been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial.").

Essentially what the government did was (1) to find the first general time in which one person (Mr. Jackson) allegedly sold crack to another (Mr. Babb), and (2) allege that the conspiracy "began" on that date. Then, because the government did not recover the guns from Mr. Babb's house until August 18, 2004 –well after the last known contact amongst the defendants– the conspiracy is arbitrarily alleged to have "ended" on that date. What is absent from the record between those dates is any evidence of "one overall agreement, or one general business venture." *See Leavis*, 853 F.2d at 218.

It is not unfair to view the evidence in this case of comprising four distinct conspiracies. First, the evidence showed that Mr. Jackson was selling Crack to Mr. Babb in 2002. The overlap of actors notwithstanding, there is no evidence of a

27

connection between that activity and the trip of the parties to El Paso, Texas in

October, 2003. Subsequently, Mr. Moore and Ms. Harper were arrested in

Maryland on November 6, 2003. After that, Mr. Babb is alleged to have provided

cash and crack to Ms. Bush. Ms. Bush, in turn, is not alleged to have been involved

in any of the preceding activities. Finally, there is utterly no evidence of an overall

agreement –or any agreement– after March, 2004.

 "Whether there is a single conspiracy or multiple conspiracies depends upon

the overlap of key actors, methods, and goals." *Leavis*, 853 F.2d at 218. While key

actors in this case perhaps "overlapped," there is no overlapping of methods or

goals. "The focus of a conspiracy is the single-mindedness to achieve a *particular*

goal." *Nunez*, 432 F.3d at 578 (emphasis added). The goal in this case, according to

the indictment, was to "distribute…cocaine and crack for the purposes of making

money." It offends common sense to construe this general objective as a particular

goal.

 Each separate conspiracy in this case had differing goals that changed with

the circumstances. Construing the evidence in a light most favorable to the

government, Mr. Jackson distributed crack to Mr. Babb for Mr. Babb to distribute

to purchasers in Greensboro North Carolina at his "crack house" in 2002. The goal

of the trip to Texas, some five months after Mr. Jackson was arrested, was to

provide Mr. Robinson with a new supplier of crack and for Mr. Moore to make

28

what essentially amounts to a broker's commission from what Mr. Moore bought.
Whatever happened next between Mr. Moore, Mr. Robinson, and Ms. Withers
therefore necessarily changed the goal of that criminal conspiracy because Mr.
Robinson was killed. After Ms. Harper and Mr. Moore were arrested in Cecil
County, Maryland, there is little evidence to suggest any continuation of the goals
of the conspiracy formed in El Paso, Texas. The only evidence generated after the
arrest of Mr. Moore and Ms. Harper suggests that Mr. Babb supplied Bush with
money and crack to pay for Mr. Moore's attorney and to provide for his
commissary at the detention center. Finally, there is simply no evidence
whatsoever of a conspiracy after Bush's arrest.

Moreover, there is no overlap of similar methods, no central figure, and no
evidence of a structure of any sort. While a single conspiracy may be "a loosely-
knit association of members," they must be "linked only by their mutual interest in
sustaining the overall enterprise of catering to the ultimate demands of a particular
drug consumption market." *Banks*, 10 F.3d at 1054. Here, there is no evidence of a
particular drug market, nor any similarity among the methods used for distribution.

The evidence in this case is therefore distinguishable from that of
*Squillacote*, *Stockton*, and *Bowens.* All of the conspirators in *Squillacote* (1) were
recruited by the same person, (2) were trained in the same methods of espionage,
(3) were financed by the same organization, and (4) used the same modes of

29

communication with the MfS. *Squillacote*, 221 F.3d at 548-552, 574. In *Bowens*, this Court found the existence of a large crack distribution ring with an "inner circle" in which the defendant was involved and which he even led at times. It even had a name (the "Poison Clan"). This Court also found that "the several contingents of the Clan used common methods of operation… common participants…and common leadership and direction…" *Bowens*, 224 F.3d at 307-308. In *Stockton*, this Court found that "[T]he evidence at trial showed rather compellingly that one, and only one, enterprise controlled the distribution of heroin in the Park Heights neighborhood of Baltimore from 1994 through 1999, and that it operated as one continuous business enterprise." *Stockton*, 349 F.3d at 762. The case now before this Court is utterly distinct. There is no evidence of a recruiting figure, no identifiable methods, no modes of communication, no distribution ring nor inner circle, no identifiable leader, no target market, and certainly no singular enterprise.

The evidence adduced at trial simply failed to demonstrate that the appellants shared a "single-mindedness to achieve a particular goal." For these reasons, the government failed to prove the existence of the single, overall conspiracy charged in the indictment and, as a result, the appellants were prejudiced by the district court's refusal to provide an instruction as to multiple conspiracies.

30

**II.    THE DISTRICT OF MARYLAND WAS NOT THE PROPER VENUE IN WHICH TO PROSECUTE COUNT SEVEN OF THE THIRD SUPERSEDING INDICTMENT (POSSESSION OF FIREARMS IN FURTHERANCE OF A DRUG TRAFFICKING CRIME IN VIOLATION OF 18 U.S.C. § 924 (C)) BECAUSE THE FIREARMS WERE RECOVERED IN NORTH CAROLINA AND THERE WAS NO CONSPIRACY IN MARYLAND IN FURTHERANCE OF WHICH THE FIREARMS COULD HAVE BEEN POSSESSED.**

### A.    Standard of Review and Applicable Procedure

This Court reviews *de novo* the district court's determination of venue in a criminal case. *United States v. Wilson*, 262 F.2d 305, 320 (4th Cir. 2001). "The government has the burden of establishing, by a preponderance of the evidence, that venue is proper." *Id.*

### B.    Substantive Law on Venue for 18 U.S.C. § 924 (c) in furtherance of 21 U.S.C. § 846

"When defendants are charged with multiple counts, venue must lie as to each individual count." *United States v. Smith*, 452 F.3d 323, 335 (4th Cir. 2006) (citing *United States v. Robinson*, 275 F.3d 371, 378 (4th Cir. 2001)). "To determine the appropriate venue for trying a crime, we must identify the conduct constituting the offense and then discuss the location of the commission of the criminal acts." *United States v. Barnette*, 211 F.3d 803, 813 (4th Cir. 2000) (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)).

"[I]n a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy

31

transpires." *United States v. Bowens*, 224 F.3d 202, 311 (4th Cir. 2000). If an

indictment alleges a violation of 18 U.S.C. § 924 (c), the "essential conduct

elements" for purposes of determining venue are (1) the drug trafficking crime and

(2) the possession of the firearms which furthered the drug trafficking crime.

*Smith*, 452 F.3d at 335-336. Therefore, where an indictment alleges possession of

firearms in furtherance of a conspiracy to distribute cocaine, venue is proper

wherever the firearms were possessed and wherever overt acts in furtherance of the

conspiracy were taken. *Id*.

     "Once a conspiracy is established, however, it is presumed to continue

unless or until the defendant shows that it was terminated or he withdrew from it."

*United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986) (citing *Hyde v. United

States*, 225 U.S. 347, 369-70 (1912)). "A mere cessation of activity in furtherance

of the conspiracy is insufficient." *Id.* (citing *United States v. Goldberg*, 401 F.2d

644, 648 (2nd Cir. 1968)). "The defendant must show affirmative acts inconsistent

with the object of the conspiracy and communicated in a manner reasonably

calculated to reach his co-conspirators." *Id.* (citing *United States v. United States

Gypsum Co.*, 438 U.S. 422, 464-65 (1978)). However, this Court has recognized

that a conspiracy can be frustrated or aborted by outside intervention. *See, e.g.

United States v. Brantley*, 777 F.2d 159, 163 (4th Cir. 1985) ("Unlawful

conspiracies may be frustrated or aborted for a variety of reasons, including the

intervention of law enforcement officials before the unlawful purpose is accomplished.")

### C.    Relevant Facts

On April 18, 2006, the district court held a re-arraignment on the Third Superseding Indictment and a hearing on venue. Therein, the Appellants argued, *inter alia*, that venue was improper in Maryland on Count Seven of the indictment because the evidence showed that any conspiracy had terminated prior to August 18, 2004. (JA 32-55). That date was the date on which the firearms relied upon by the government in Count Seven were recovered in North Carolina. The evidence adduced at that point, and at trial, showed no contact between Mr. Babb and Mr. Moore after March 26, 2004. (JA 43). Moreover, the evidence indicated no further contact between Ms. Bush and Mr. Moore after July 14, 2004. (JA 1174).

### D.    Argument

The critical element missing from this case is proof that the weapons recovered in North Carolina on August 18, 2004 were possessed "in furtherance of" the conspiracy proven at trial. The government established that overt acts in furtherance of the conspiracy occurred in Maryland. The government also established that several firearms were recovered in North Carolina. Critically, however, the government failed to establish that the firearms recovered in North Carolina were possessed in furtherance of the conspiracy because the firearms

33

were recovered long after the last communication among the conspirators. (JA 1125).

While the mere arrest of some of the conspirators is insufficient, alone, to establish the termination of the conspiracy, when considered with the total lack of communication amongst the defendants, it is sufficient to show that the conspiracy had terminated. Moreover, no evidence presented at trial linked any of the weapons recovered in North Carolina to the conspiracy alleged in the indictment. As set forth above, there is ample evidence – discussed at the hearing on venue and admitted at trial – by which the Appellants met their burden to demonstrate the termination of the conspiracy no later than Bush's arrest on July 14, 2004. Because the weapons were recovered after the termination of the conspiracy, and because there is no other evidence by which they are linked to the conspiracy, they were not possessed in furtherance of the drug trafficking crime for which venue in Maryland was proper. It follows that the venue for the substantive 18 U.S.C. § 924 (c) violation alleged in Count Seven does not properly lie in Maryland.

Moreover, to the extent a conspiracy existed, it was utterly destroyed by the arrest of Ms. Bush. *See Brantley*, 777 F.2d at 163 ("Unlawful conspiracies may be frustrated or aborted for a variety of reasons, including the intervention of law enforcement officials before the unlawful purpose is accomplished.").

34

Finally, even if venue is found to have been proper, the Appellants'

convictions under 18 U.S.C. § 924 (c) must still be reversed for insufficiency of the

evidence. "The Due Process Clause of the Fourteenth Amendment 'protects the

accused against conviction except upon proof beyond a reasonable doubt of every

fact necessary to constitute the crime with which he is charged.'" *Francis v.*

*Franklin*, 471 U.S. 307, 313 (1985) (quoting *In re Winship*, 397 U.S. 358, 364

(1970)). *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). 18 U.S.C. § 924

prohibits the possession of firearms during or in relation to a drug trafficking

crime. The only drug trafficking crime charged in the indictment was a

distribution conspiracy which, as explained above, had terminated at the time the

guns were recovered.

## III. THE DISTRICT COURT REVERSIBLY ERRED IN REFUSING THE APPELLANTS' REQUEST FOR A JURY INSTRUCTION ON REASONABLE DOUBT BECAUSE A CRIMINAL VERDICT BASED ON A STANDARD OF PROOF LESS THAN REASONABLE DOUBT IS UNCONSTITUTIONAL.

### A.     Standard of Review and Applicable Procedure

As provided, *supra*, the district court's denial of a requested jury instruction

is subject to review by this Court for abuse of discretion. *Romer*, 148 F.3d at 843.

### B.     Argument

At the charge conference following the close of the evidence, the Appellants

requested that the jury be instructed as to the definition of reasonable doubt.

35

Noting that it felt confined by the law of the Fourth Circuit, the district court refused the request. (JA 1180-1181).

The Sixth Amendment of the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. Amend. VI. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *United States v. Gaudin*, 515 U.S. 506, 510 (1995).

The appellants acknowledge that this Court has held that it is improper to instruct a jury as to the standard of reasonable doubt. *See, e.g., United States v. Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995). Nonetheless, the appellants respectfully contend that the concept of reasonable doubt is at the foundation of our criminal justice system and a definition of it is necessary to protect the due process rights of the criminally accused. *See Sullivan v. Louisiana*, 508 U.S. 275, 277-278 (1993) ("It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty....the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.").

One of the dangers of leaving twelve jurors to their own uninformed perceptions of the meaning of "beyond a reasonable doubt" is that they may likely

36

employ an unconstitutional understanding of the term. "If a jury can choose between "alternative theories, the unconstitutionality of any of the theories requires that the conviction be set aside." *See, e. g.*, *Stromberg v. California*, 283 U.S. 359 (1931); *Leary v. United States,* 395 U.S. 6, 31-32(1969); *Sandstrom v. Montana*, 442 U.S. 510, 526 (1979); *California v. Roy*, 519 U.S. 2, 6-8 (1996). Therefore, an unconstitutional understanding of "beyond a reasonable doubt" applied by a juror would result in an unconstitutional verdict.

IV. **THE DISTRICT COURT ERRED IN FAILING TO *VOIR DIRE* THE JURY UPON LEARNING THAT SOME JURORS MAY HAVE BEEN INTIMIDATED BY PERSONS SEATED IN THE GALLERY BECAUSE THIRD-PARTY CONTACT WITH A JUROR, WHETHER DIRECT OR INDIRECT, IS PRESUMPTIVELY PREJUDICIAL.**

A. **Standard of Review & Applicable Procedure**

This Court reviews for plain error allegations of improper judicial actions for which contemporaneous objections were not made below. Under the plain error standard set out in *United States v. Olano*, 507 U.S. 725, 732-36 (1993), the defendant must show (1) there is an error, (2) that it is plain, (3) that it affects substantial rights of the defendant, and (4) that is affects the fairness, integrity, or public reputation of a judicial proceeding.

B. **Substantive Law on Juror Influence**

The right to a fair trial is bedrock of American jurisprudence. *Irvin v. Dowd*, 366 U.S. 717, 721 (1961). One of the most critical components of this principle is

37

the Sixth Amendment right to a trial by an impartial jury. *Id*; *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1998).    The failure to provide such a jury deprives a criminal defendant of a fair trial and "violates even the minimal standards of due process." *Id*. at 722; *In re Murchison*, 349 U.S. 133 (1955).    The impartiality of jurors cannot be ensured unless it is certain that their verdict rested solely "upon the evidence developed at trial." *Irvin*, 366 U.S. at 722.   Influence that comes from outside the four corners of the trial record is impermissible.  *Mattox v. United States*, 146 U.S. 140, 150 (1892) ("[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.").  This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965).

The Supreme Court has not minced words with regard the gravity of outside influences on the sanctity of the jury.  In *Remmer v. United States*, 347 U.S. 227 (1954) (" Remmer I "), the Court established that any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury" is deemed "presumptively prejudicial."   When such interference is demonstrated the burden is on the Government to rebut the

38

presumption by proving that the error was harmless beyond a reasonable doubt. Id. at 229.

Interference with the jury can come in many forms: phone calls, comments, stares. *See, e.g., United States v. Norton*, 700 F.2d 1072 (6th Cir. 1983) (phone call); *Strickland v. Virginia*, 852 F.2d 740 (4th Cir. 1988) (comment to jurors by patron at restaurant); *United States v. Rutherford*, 371 F.3d 364 (9th Cir. 2004) (stares). The actual content of the outside influence is of no moment. What is prohibited is "unauthorized intrusions" into the "sanctity of the jury's right to operate as freely as possible." *Remmer v. United States*, 350 U.S. 377, 382 (1956) (" *Remmer II* "). "A juror must feel free to exercise his function without ... anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions."). *Remmer I*, 347 U.S. at 229. Simply put, prejudice is presumed if "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560 (1986). *See also, United States v. Armstrong*, 654 F.2d 1328, 1332 (9th Cir.1981) ("we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial."); *Hunley v. Godninez*, 975 F.2d 316 (7th Cir. 1992) (burglary of four jurors' hotel rooms raised presumption of prejudice); *Gold v. United States*, 352 U.S. 985 (1957) (*per curiam*) (irrelevant whether intrusion was intentional, only question is whether it was prejudicial); *United States v.*

39

*Henley*, 238 F.3d 1111, 1117 (9th Cir. 2001) (presumption of prejudice applies upon a showing that the "intrusion interfered with the jury's deliberations by distracting one or more of the jurors").

The interference of third parties with the sanctity of the jury affects both the defendant's due process right to a fair trial and the systemic integrity of the judicial system. To protect these interests, the Supreme Court has counseled that if the court becomes of aware that an improper influence may have taken place, the court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229-30. Once the court has determined that the circumstances of the intrusion raise the specter of jury bias, the Government bears a heavy burden of demonstrating that the intrusion was harmless beyond a reasonable doubt. *Id*.

Generally, the inquiry demanded of the court involves questioning the jurors to determine precisely what happened. The court will then question each juror to determine what if, any impact the intrusion had on his ability to remain fair and impartial. *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984). For example, in *United States v. Brown*, 923 F.2d 109 (8th Cir. 1991), jurors reported that they were intimidated by the presence of spectators in the courtroom. The court questioned each juror in chambers and determined that no improper contact had taken place. Spectators were seated fairly close to jurors and had attempted to start up friendly

40

conversation, which, the court found, was not prejudicial.  Moreover, each juror reported that the interactions had not affected their ability to be impartial. *See also, e.g., Norton*, 700 F.2d 1072 (jurors polled after one juror received phone call saying "just be sure you make the right choice" and reported that impartiality unaffected).

Even careful instruction of the jury does not negate the requirement that the judge interview the jurors.  In *United States v. Vasquez-Ruiz*, 502 F.3d 700 (7th Cir. 2007), a juror found the word "GUILTY" written in her juror notebook, an action which she found intimidating.  The court attempted unsuccessfully to determine who wrote the note, but did not question the jury regarding its impact on them.  Instead, the court gave a substantial cautionary instruction.  The Seventh Circuit concluded that the instruction was insufficient.

> District court judges have broad discretion to choose how to handle different problems that arise with juries. We will reverse only if they stray beyond these generous boundaries. But, as we have noted from time to time, "deference" does not mean "total acquiescence." The court recognized that the note raises two general concerns. The first is that Diaz may have been intimidated or somehow influenced improperly by its appearance in her notebook. The second set of issues relates to the content of the note. [T]he real question is the legal one of who bears the risk of uncertainty in this situation-the prosecution or the defendant? On the assumption that someone external to the jury wrote this word, we read *Remmer* as holding that it is the prosecution.

*Id*. at 705.

41

## C.    Relevant Facts

In this case, after the jury had been selected, but prior to the delivery of

opening arguments, the court made the following statement:

> Counsel, there have been some regular attendees at this trial who I
> take it are family members, acquaintances of one or both of the
> Defendants.  It would appear that perhaps jurors believe too much
> attention is being paid to them.  It's a rather unusual circumstance, but
> I've heard it before. Obviously, it's not unusual for participants in a
> trial to watch the jury, but we want to be sure that the jury is not made
> uncomfortable.  So, if I'm correct that the regular attendees have been
> members of the family or friends of the Defendants, I would
> appreciate counsel commenting to them when and as appropriate that
> we don't want to make the jurors uncomfortable...

JA (April 10, 2007 p. 142). The court did not ask any of the jurors whether the

intimidation that had been reported affected their ability to be fair and impartial.

## D.    Argument

The district court was required to interview the jurors.  First, the court

clearly believed that an intrusion took place because it "appeared" to him that the

jurors felt undue attention was being paid them.  Second, the outside contact was

of the sort that could interfere with jury impartiality.  The court was made aware

that jurors were being stared at in a way that made them "uncomfortable."  Courts

have found such conduct to be the kind of "unauthorized intrusion" prohibited by

the Supreme Court. *See Rutherford*, 371 F.3d 364.  *See also*, *United States v.*

*Ducktel*, 192 F.3d 893, 897 (9th Cir. 1999) ("even indirect coercive contacts that

42

could affect the peace of mind of the jurors give rise to the *Remmer* presumption.").

It was thus incumbent upon the court to conduct a *Remmer* hearing, or at the very least, issue a curative instruction. The failure to do so was error. The fact that the court was presented with circumstances that should give rise to a *Remmer* hearing and that he did not do so is plain on the record. The error affected the defendants' fundamental rights by denying them the basic, bedrock right of a fair trial by an impartial jury, for "even a single partial juror violates a defendant's constitutional right to a fair trial." *United States v. Angulo*, 4 F.3d 843, 848 (9th Cir. 1993). Finally, allowing a trial to proceed despite the fact that third parties have successfully been able to rattle the jury, with no further inquiry, undermines the integrity of the process as a whole, particularly to the extent that it involves civilian participants in it – namely the jurors.

## CONCLUSION

For the reasons set forth herein, the judgments of conviction imposed upon the appellants by the district court must be vacated and the case remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

The Defendant-Appellants request respectfully request oral argument.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. Pro. 32 (a) (7) (b) because this brief contains **10,477** words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a) (7) (B) (iii).

2.    This brief complies with the typeface requirement of Fed. R. App. P. 32 (a) (5) and the type style requirements of Fed. R. App. P. 32 (a) (6) because this brief has been prepared in a proportionally spaced typeface **Microsoft Word, in fourteen-point font size using Times New Roman type style**.

3.    We understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, we will provide an electronic version of the brief and/or a copy of the word or line print out.

## CERTIFICATE OF SERVICE

We hereby certify that, on February 4, 2009, this Brief of the Appellants was filed in electronic format with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit.

_____/s/_____
William C. Brennan, Jr.


_____/s/_____
Joseph Murtha

44